Axel N. ELIASEN, on behalf of himself
and all others similarly
situated, Plaintiff,

v.

GREEN BAY & WESTERN RAILROAD
COMPANY, et al., Defendants.

Civ. A. No. 80–C–1092.

United States District Court,
E.D. Wisconsin.

Sept. 13, 1982.

See also, D.C., 93 F.R.D. 408.

Robert K. Steuer and Douglas A. Woodward, Weiss, Steuer, Berzowski, Brady & Donahue, and William J. Mantyh, Honeck, Mantyh & Arndt, Milwaukee, Wis., for plaintiff.

Thomas O. Kloehn and Charles A. Grube, Quarles & Brady, Milwaukee, Wis., for defendants.

## DECISION AND ORDER

REYNOLDS, Chief Judge.

The plaintiff in this action, Axel N. Eliasen, sues as the representative of a class consisting of all holders of Class B debentures of the defendant Green Bay & Western Railroad Company (GB & W) as of November 29, 1977, excluding the members of the board of directors and those persons and entities holding such debentures for the benefit of the directors or members of their families. The individual defendants, H. Weldon McGee, R.B. Wilson, John Winthrop, and Charles W. Cox II, were directors of the GB & W in November of 1977. The plaintiff alleges that the individual defendants breached their fiduciary duty to the holders of Class B debentures by failing to act on an acquisition proposed

by Itel Corporation (Itel) in a letter dated November 26, 1977, and by subsequently recommending acceptance of an Itel tender offer. The plaintiff further alleges that Itel's subsequent acquisition of the GB & W through a tender offer was a *de facto* sale or reorganization of the railroad which entitles the holders of the Class B debentures to a *pro rata* distribution of the net proceeds after payment to persons with prior claims. The plaintiff seeks damages and liquidation of the GB & W, if necessary, to satisfy the claims.

On August 3–4, 1982, this case came before the Court for oral argument. The argument was primarily held to assist the Court's consideration of the pending cross-motions for summary judgment. Plaintiff filed a motion for interlocutory summary judgment on the issue of liability on September 21, 1981. This was followed by the defendants' motion for summary judgment filed on October 19, 1981. For the reasons given below, defendants' motion will be granted and the plaintiff's motion denied.

Other motions presently before the Court are the defendants' motion to strike Robert K. Steuer's affidavit submitted in support of plaintiff's motion for summary judgment, defendants' motion to consolidate this action with the case of *Drexler v. Green Bay & Western Railroad,* No. 80–C–1155 (E.D.Wis., filed Dec. 23, 1980), currently before Judge Warren, and the defendants' motion to file second amended answers. The defendants' motion to add a counterclaim, filed on January 27, 1982, was withdrawn by the defendants at the oral argument. This Court's disposition of the summary judgment motions renders these remaining motions moot.

The plaintiff Axel N. Eliason is a citizen of the State of Illinois. The defendant GB & W is a railroad corporation organized and existing under the laws of the State of Wisconsin with its principal offices in Green Bay, Wisconsin. The individual defendants are all citizens of states other than Illinois. Therefore, this court has diversity jurisdiction under 28 U.S.C. § 1332.

I. *Facts Giving Rise to This Suit*

The GB & W was created in 1896 by taking over the assets of a railroad then in foreclosure and receiving $600,000 in newly contributed capital. The capital structure after reorganization was as follows:

Capital stock, $2,500,000, $100 par value.

Class A debentures, $600,000, $1,000 face value.

Class B debentures, $7,000,000, $1,000 face value.

Pursuant to the plan of reorganization, the 25,000 shares of capital stock were issued to the holders of the first mortgage bonds of the predecessor company, the 600 Class A debentures were issued to the contributors of the $600,000 seed capital, and the 7,000 Class B debentures were issued to the holders of the second mortgage bonds and the common and preferred stock of the old company. None of the three classes of securities had maturity dates or fixed rates of return. Annual payments on all classes were subject to the discretion of the board of directors, up to a maximum of five percent on the capital stock and Class A debentures. Only the capital stock had voting rights.

This capital structure remains intact today. The Class B debentures were reissued in 1957, but the material provisions on the debentures remained the same. Over the years, however, the GB & W purchased some of its securities so as to reduce the number of outstanding securities. By 1975, the following securities were outstanding:

Capital stock, 18,000 shares.

Class A debentures, 3 debentures.

Class B debentures, 6,376 debentures.

The plaintiff's claim for relief is based upon a series of events beginning in late 1974 and finally culminating in the acquisition of a majority stock interest in the GB & W by Itel Corporation. On October 22, 1974, the Burlington Northern, Inc. (BN), made a public tender offer for all classes of GB & W securities. The terms of the offer, subject to Interstate Commerce Commission (ICC) approval, were $100 per share for common stock, $1,000 for each Class A de-

benture, and $250 for each Class B debenture. The GB & W board of directors voted to support the BN offer.

During the pendency of the BN offer, a consortium of competing midwestern railroads opposed the BN offer before the ICC and the courts. These railroads were the so-called "Three Lines"—the Soo Line Railroad Company; the Chicago, Milwaukee, St. Paul & Pacific Railroad Company; and the Chicago & Northwestern Transportation Company. Also opposing the BN offer before the ICC were a group of Class B debenture holders, led by Joseph M. Drexler, who complained that they were not offered enough for their securities. The plaintiff in this action, Mr. Eliasen, also wrote letters to the ICC, generally opposing the BN offer, supporting the application of the Three Lines to purchase and liquidate GB & W's railroad and property, and endorsing the position of Mr. Drexler. On July 15, 1977, the ICC issued a report approving the BN offer, rejecting the Three Lines' opposition thereto and applications to purchase the assets, and expressly rejecting the objection raised by Mr. Drexler on the grounds that if the Class B debenture holders did not like the price offered by BN, they had only to hold on to their securities to protect their rights fully. The Three Lines then obtained a stay of the ICC approval from the Seventh Circuit Court of Appeals.

While the ICC approval of the BN tender offer was thus stayed, a new tender offer was made by the Brae Corporation. Mr. William Texido, a former officer of Itel, formed the Brae Corporation (Brae) on August 7, 1977, to engage in the business of leasing railroad freight cars. On November 22, 1977, Brae made a tender offer for all classes of GB & W securities, offering $150 per share of common stock, $1,000 per Class A debenture, and $275 per Class B debenture.

This offer was outstanding when on November 28, 1977, Mr. Weldon McGee, the president of GB & W, received a telephone call from Mr. Joseph Costello, the president of Itel's SSI Rail Corporation (later to become Itel Rail Division). During this call,

Mr. Costello informed Mr. McGee that Itel had mailed a letter dated November 26, 1977, expressing Itel's interest in acquiring the GB & W. Mr. McGee responded that he had not received the letter and that he was leaving for New York that day to attend a meeting of the GB & W board of directors on the following day. The primary purpose of that meeting was to consider the Brae offer.

Thus, Mr. Costello had a copy of Itel's letter of November 26, 1977, delivered by messenger to the GB & W board of directors meeting in New York on Tuesday, November 29, 1977. The letter expressed Itel's interest in effecting a statutory merger or purchase of assets of GB & W for $5,800,000. Itel's letter also stated that if the board did not respond favorably to the suggested merger or sale of assets, Itel would make a tender offer for GB & W securities of $225 per share of stock, $1,000 per Class A debenture, and $275 per Class B debenture.

The board received and considered the Itel proposal but did not act upon it because the Itel acquisition required ICC approval, which presumably would result in the same delays that were still holding up the BN offer. Instead, the board voted to recommend the Brae offer to the securities holders. The Brae offer had already lured most securities out of the BN escrow, and the BN had indicated that it would not issue an amended tender offer. Thus, although the ICC finally approved the BN offer on November 30, 1977, the day after the board meeting, the BN withdrew its tender offer on December 1, 1977.

During the November 29 meeting, Mr. McGee was called out to speak with Mr. Costello on the telephone. Mr. Costello asked what action the board had taken and, upon being told, said that he would visit Mr. McGee in Green Bay within the next several days. Mr. McGee returned to his office in Green Bay on November 30, 1977, and received the promised visit on either Thursday, December 1, or Friday, December 2, 1977. Mr. Costello, accompanied by Itel's Detroit rail representative, Mr. Manasco,

spent about a half hour between planes discussing Itel's plans with Mr. McGee.

Mr. McGee was informed that Itel had decided to make a tender offer to GB & W's securities holders. Mr. McGee implored Mr. Costello to dissuade Itel from doing so, explaining that the board had already recommended the Brae offer and that Itel would encounter protracted proceedings and obstacles in the ICC. Mr. Costello was unmoved and told Mr. McGee that the decision was irrevocable.

The next contact GB & W had with Itel was a phone call from the chief in-house counsel of Itel, Mr. Herman Howerton, who called Mr. McGee at home on an evening or during the weekend of December 3–4, 1977. This call occurred shortly after the Costello-Manasco visit to GB & W. Mr. Howerton sought an appointment at 1:30 p.m. on Thursday, December 8, 1977, to present a formal tender offer on behalf of Itel to GB & W for mailing to GB & W securities holders. The appointment was set.

Without forewarning, Brae delivered an amended tender offer to GB & W for mailing on Wednesday, December 7, 1977. This amended offer sharply increased the prices offered for all classes of GB & W securities over the pending Brae tender offer by offering $225 per share of common stock, $1,050 per Class A debenture, and $300 per Class B debenture. After GB & W provided mailing address labels for all known securities holders, on December 7, 1977, the amended Brae tender offer was delivered to the escrow bank for mailing along with a letter signed by Mr. McGee recommending Brae's amended tender offer.

The following day, Mr. Howerton, accompanied by a Mr. Platt, appeared for his appointment. They delivered Itel's formal printed tender offer for mailing. Mr. Howerton at that time explained to Mr. McGee that Itel was presenting a voting trust plan to the ICC which would allow Itel to proceed with the tender offer by having all securities tendered paid for in cash and held in trust pending final ICC approval. Hence, even if the ICC were to deny approval of the Itel acquisition, the GB & W

securities holders would already have been paid, and Itel alone would bear the risk of divesting the securities held by the trustee.

The terms of the Itel tender offer were identical to the amended Brae offer. After Mr. McGee so informed the Itel representatives, they asked Mr. McGee to inquire whether the Brae offer had been mailed. Mr. McGee telephoned the Brae escrow bank and reached Mr. Texido who refused to disclose whether the offer had been mailed. The Itel representatives then retired to a private office with a telephone, and in approximately a half hour rejoined Mr. McGee and Mr. Frederick Trowbridge, GB & W's attorney. The Itel representatives presented Mr. McGee with a handwritten letter which incorporated all the terms of the formal Itel tender offer but increased the prices offered for each class of GB & W securities. The increased prices offered by Itel were $330 per share of common stock, $1,050 per Class A debenture, and $325 per Class B debenture.

On the following day, Friday, December 9, 1977, a printed copy of the amended Itel tender offer arrived at GB & W and was mailed out with a cover letter signed by Mr. McGee. Mr. McGee's letter informed the securities holders that the board of directors of GB & W had withdrawn their recommendation of the Brae offer and were making no recommendations. On Monday, December 12, 1977, inquiries from GB & W securities holders began flowing in to GB & W and its directors seeking advice on how to proceed. The directors realized that some board position was necessary. On Wednesday, December 14, 1977, the board sent a mailgram to all known GB & W securities holders recommending acceptance of the Itel amended offer.

On January 20, 1978, the ICC denied a Brae request for a cease and desist order that would have prohibited Itel from proceeding with the acquisition of GB & W securities by the voting trust. On October 12, 1978, the ICC finally approved Itel's takeover of GB & W, and Itel took the tendered securities from the voting trust. Itel acquired over 97% of the outstanding

common stock, over 4,919 Class B debentures, and two of the three outstanding Class A debentures.

## II. *History of the Class B Debentures*

### A. *Facts Surrounding the Creation of the Debentures*

The Class B debentures are an unusual security that cannot easily be classified. The rights that the holders of Class B debentures enjoy cannot be ascertained merely by referring to the terms of the instrument and the GB & W's articles of incorporation. Interpretation of their rights requires an understanding of the circumstances surrounding the organization of the GB & W in 1896 and of the litigation that has already occurred over these debentures.

The railroad that was taken over by the GB & W in 1896 was constructed during the years 1871–1873 by the Green Bay & Lake Pepin Railway Company. That company had been chartered on April 12, 1866, and had raised the funds to construct the railroad. In September of 1873, the company changed its name to the Green Bay & Minnesota Rail Road Company.

On January 23, 1878, the Green Bay & Minnesota Rail Road Company went into receivership, and the mortgage bondholders foreclosed on their mortgages. On May 16, 1881, a committee of the mortgage bondholders chartered the Green Bay, Winona & St. Paul Railway Company. The property of the Green Bay & Minnesota Rail Road Company was sold at a foreclosure sale to the Green Bay, Winona & St. Paul Railroad Company.

The new company was no more successful than its predecessor. The Green Bay, Winona & St. Paul Railroad Company defaulted on the interest payments due on its first mortgage bonds on August 1, 1888, and went into receivership on July 31, 1890. In 1892, a voluntary reorganization agreement was reached, but this reorganization did not succeed. On December 27, 1895, another foreclosure sale was ordered. At the sale in May of 1896, Mark T. Cox of Morristown, New Jersey, for a committee for the first

consolidated mortgage bondholders consisting of himself, C. Ledyard Blair of New York City, and William Jay Hunt of Jersey City, purchased the property of the La-Crosse Branch of the railroad for $20,000, of which $10,000 was deposited in cash, and the property of the Main Line of the railroad for $1,000,000, of which $85,000 was deposited in cash.

On May 27, 1896, the charter of the Green Bay & Western Railroad Company was issued, embodying a plan of reorganization between the securities holders of the old Green Bay, Winona & St. Paul Railroad Company. The members of the first consolidated mortgage bond committee, Messrs. Cox, Blair, and Hunt, along with Messrs. Palmer and Wilson were identified as the purchasers of the railroad and property and as the incorporators and first board of directors of the GB & W. The articles of incorporation provided for three types of securities: $2,500,000 of $100 par value capital stock; $600,000 of $1,000 face value Class A debentures; and $7,000,000 of $1,000 face value Class B debentures.

The 25,000 shares of capital stock were distributed to the first mortgage and first consolidated mortgage bondholders of the Green Bay, Winona & St. Paul Railroad Company. The 7,000 Class B debentures were to be distributed to the holders of the second mortgage income bonds and to the holders of the common and preferred stock of the Green Bay, Winona & St. Paul Railroad Company. However, the issuance of the Class B debentures was conditioned upon the purchase by the committee of second mortgage income bonds and preferred and common stockholders of the Green Bay, Winona & St. Paul Railroad Company of the 600 Class A debentures for the sum of $570,000 in cash.

None of the three classes of securities have a fixed rate of return, and such payments as might have been paid are not cumulative. Furthermore, none of the securities have a maturity date; the Class A and Class B debentures are payable only in the event of a sale or reorganization of the

railroad and property of the company. Only the capital stock has voting power.

By its terms, the Class B debenture is subordinate to the capital stock and Class A debentures for distribution of income. The debenture provides that such income as was to be distributed would be distributed as follows:

"[T]he holders of this series of Debentures shall in lieu of interest thereon participate in the distribution of annual net income to the following extent only; viz., so much of the annual net earnings of the said Company in any year as would be applicable to the payment of dividends on stock shall be applied as follows: viz., to the holders of Class A Debentures 2½% upon the face value thereof, or if such annual net earnings are insufficient for the payment of the same, then all of such net earnings shall be distributed pro rata among the holders of said Class A Debentures. After the payment of 2½% upon the face value of Class A Debentures, the stockholders of the Company are entitled to receive the balance of such net earnings until 2½% shall have been paid out of the same upon the par value of the said stock, and all surplus net earnings then remaining shall be paid to the holders of Class A Debentures and of the stock, pro rata, until 5% shall have been paid upon the face value of said Debentures and upon the par of said stock for such year, and any surplus net earnings arising in such year which may then remain shall be paid to and distributed among the holders of Class B Debentures pro rata."

In the event of a "sale or reorganization of the railroad and property of said company," the net proceeds would be applied first to the payment of all liens and charges. If any money were left of the proceeds after payment of all liens and charges on the property, such monies were to be distributed to the holders of Class A debentures and common stock *pro rata*. If any monies remained after payment of $600,000 to the holders of Class A debentures and $2,500,000 to the stockholders, the remainder was to be applied *pro rata* to the payment of the Class B debentures.

### B. *Litigation Over the Debentures*

The GB & W prospered through the years, and the peculiar capital structure of the company spawned litigation. The first litigation involving the nature of the Class B debentures was *Green Bay & Western Railroad v. C.I.R.,* 147 F.2d 585 (7th Cir. 1945). The question before the Court was whether amounts paid to the holders of Class A and Class B debentures by the GB & W should be treated as interest or dividends under the income tax laws.

The Court held that they should be treated as dividends and justified its conclusion by reference to the character of the debentures:

"The debentures on their face disclose that they had no fixed maturity; that the dividends were not cumulative and were payable within the discretion of the board of directors; that there was no provision for interest on unpaid dividends; that the debenture holders had no right to maintain an action in case of default as to the payment of dividends inasmuch as such payment was in the discretion of the board of directors; that the status of the debenture holders of class A was on a par with that of stockholders; and that rights of the debenture holders, both class A and class B, were inferior to those of creditors. Moreover, the investments in the debentures represent value paid in at the time of petitioner's incorporation and constitute a large part of its operating capital. Furthermore, the investments can be withdrawn only at the dissolution of the corporation. They are subject to the hazards of the business and in our opinion may properly be designated as a part of the capital structure." 147 F.2d at 586–87.

Despite the expansive language quoted above, the holding of the Court, being a determination of the character of payments for purposes of the income tax laws, was quite narrow.

The years 1945 and 1946 witnessed efforts by the holders of Class B debentures to compel the GB & W to make annual payments of net income when net earnings were sufficient. A group of Class B debenture holders filed a class action in the United States District Court for the Southern District of New York seeking to recover what they claimed was their share of the net earnings for the years 1924 to 1943. The district court dismissed the suit on *forum non conveniens* grounds without prejudice to renewing the suit in Wisconsin.

The Second Circuit affirmed and in doing so held that the Class B debenture holders were only entitled to payments as declared by the directors. *Williams v. Green Bay & Western Railroad,* 147 F.2d 777, 779 (2d Cir.1945), *rev'd* 326 U.S. 549, 66 S.Ct. 284, 90 L.Ed. 31 (1946). On *certiorari,* the Supreme Court held that the dismissal on *forum non conveniens* grounds was improper and reversed and remanded for trial. Before the case could be tried on remand before the district court in New York, however, a judgment was handed down in a similar suit filed by Class B debenture holders in the Wisconsin courts. The New York court held that the judgment of the Wisconsin trial court was *res judicata. Williams v. Green Bay & Western Railroad,* 68 F.Supp. 509 (S.D.N.Y.1946).

The Wisconsin suit reached the Wisconsin Supreme Court. In *Biltchik v. Green Bay & Western Railroad,* 250 Wis. 177, 26 N.W.2d 633, *cert. denied* 332 U.S. 835, 68 S.Ct. 216, 92 L.Ed. 408 (1947), the plaintiffs, for themselves and all holders of Class B debentures, also sought to compel the GB & W to make annual payments of net income. The Court held that income on the Class B debentures was payable at the discretion of the board of directors and that the directors had not abused their discretion.

The holding in *Biltchik* was influenced both by the circumstances surrounding the creation of the Class B debentures and by the terms of the instrument. Regarding the 1896 reorganization, the Court found the following:

" * * * It is clear from the undisputed evidence that had the foreclosure suit proceeded in the common course of practice to sale of the mortgaged property neither the holders of the second-mortgage bonds nor the stockholders of the old company would have received anything. The scheme of reorganization was manifestly planned to assure that the holders of the subordinate securities should receive nothing whatever until the holders of the new Class A debentures and the new stock were compensated both through current income and on liquidation of the new corporation * * *. * * * " 250 Wis. at 180, 26 N.W.2d 633.

The very limited rights granted by the terms of the Class B debentures can only be understood by recognizing that these debentures were issued in exchange for worthless securities in the Green Bay, Winona & St. Paul Railroad Company.

The *Biltchik* Court relied on the provisions of the Class B debentures regarding the distribution of annual income and the distribution upon a sale or reorganization of the railroad. The Court said of the provision regarding distribution on sale or reorganization:

" * * * This as to distribution on liquidation puts the holders of the Class B debentures on the footing of stockholders of an ordinary corporation. It makes them, instead of the stockholders, the owners of the equity of the corporation. * * * " 250 Wis. at 181, 26 N.W.2d 633.

In light of those provisions of the debenture, the Court held that the following provision made payment out of annual earnings discretionary with the directors: " 'the amounts, if any, payable upon this series of debentures out of the net earnings in any year, will be fixed and declared by the board of directors on or before the first day of February in the following year.' " 250 Wis. at 181, 26 N.W.2d 633. The Court held that the directors could retain any net earnings to apply to betterments "if in their reasonable judgment proper management so requires." 250 Wis. at 181, 26 N.W.2d 633. The Court reasoned that such better-

ments would accrue to the advantage of the corporation and thereby to the advantage of the Class B debenture holders on sale or distribution.

### III. Tender Offer As "Sale or Reorganization"

■ To determine whether the plaintiffs in this case are entitled to any recovery, the Court must first determine whether the successful tender offer by Itel in 1977 was a "sale or reorganization of the Railroad and property" of the GB & W, which by the terms of the Class B debentures would entitle the holders to payment on the principal of the debenture. The Court holds that the tender offer was not such a "sale or reorganization" and that the holders of the Class B debentures were not entitled to payment on the principal in 1977.

The plaintiff has not seriously contended that the Itel tender offer was a "reorganization" of the railroad. The meaning of the term has not changed significantly since 1896. The defendants quote a federal circuit court decision from 1894 which adopted the following definition of "reorganization" from a work by Morawetz on Private Corporations:

> " 'The term 'reorganization' is commonly applied to the formation of a new corporation by the creditors and shareholders of a corporation which is in financial difficulties, for the purpose of purchasing the company's works and other property, after the foreclosure of a mortgage or judicial sale. The result of a transaction of this kind is to form a new corporation to carry on the business of the old company upon a new basis, free of its debts and obligations, except to the extent that they had been expressly assumed.' " *Symmes v. Union Trust Co.,* 60 F. 830, 870 (C.C.D.Nev.1894) (quoting from Morawetz on Private Corporations, § 812).

A more recent definition of the term is provided in Black's Law Dictionary 1462 (4th ed. 1951):

> "As applied to corporation. The carrying out, by proper agreements and legal proceedings, of a business plan for winding up the affairs of or foreclosing a mortgage or mortgages upon the property of, insolvent corporations, more frequently railroad companies. It is usually accomplished by the judicial sale of the corporate property and franchises, and the formation by the purchasers of a new corporation. The property and franchises are thereupon vested in the new corporation and its stock and bonds are divided among such of the parties interested in the old company as are parties to the reorganization plan."

Both of the above definitions of "reorganization" indicate that the corporate property is transferred to a new corporation, which implies that the securityholders in the old company no longer have an interest in the property unless they exchange their securities for securities in the new company. At a minimum, the term "reorganization" implies a change in the capital structure of the old company which results in a "new" corporation.

The Itel tender offer did not result in a change of the capital structure of the GB & W, nor were the securities in the GB & W exchanged for securities in some new company. Rather, the GB & W remained intact as the company running the railroad. The tender offer merely resulted in a change in ownership of the securities of the GB & W. Thus, the Court holds that the Itel tender offer was not a "reorganization of the Railroad and property" of the GB & W.

The meaning of the term "sale" can only be understood by reference to the context in which it is used on the Class B debentures. The debentures refer to a "sale * * of the Railroad and property of said Company." The terms "Railroad and property" are defined in *Northern Pacific Railroad v. Walker,* 47 F. 681, 685 (C.C.D.N.D.1891), *rev'd on other grounds,* 148 U.S. 391, 13 S.Ct. 650, 37 L.Ed. 494 (1893):

> " * * * The property of this railroad company is not limited to its railroad. It still owns many thousands of acres of its land grant. 'Railroad property' and 'the property of a railroad company' are not

equivalent terms. The term 'railroad property' is commonly understood to mean the property which is essential to a railroad company to enable it to discharge its functions and duties as a common carrier by rail. It includes the roadbed, right of way, tracks, bridges, stations, rolling-stock, and such like property. On the other hand, lands owned and held for sale, or other disposition, for profit, and in no way connected with the use or operation of the railroad, are not railroad property in the sense mentioned, but are property of the railroad company independently of its functions and duties as a common carrier. * * *"

This indicates that the sale of the railroad and property *of the company* refers to the sale of property owned by the company.

By contrast, a tender offer, if accepted, results in the sale of ownership of the equity securities of the company; depending on the amount of equity securities tendered and sold to the purchaser, the transaction may or may not result in the purchaser getting control of the company and may or may not result in the purchaser acquiring part or all of the equity securities outstanding.

The plaintiff cites *Dunnett v. Arn,* 71 F.2d 912 (10th Cir.1934), for the proposition that a tender offer is, in substance and effect, a sale of the assets of the company. However, this statement in *Dunnett* was made in the context of deciding whether the directors were liable to other stockholders for secret profits made on the sale of a company. Here the question is whether the "sale * * * of the Railroad and property of said Company," construed as a contractual provision contained in the Class B debenture, was intended to include sales of stock sufficient to control the company. The Court holds that this language of the Class B debenture was not intended to include tender offers, and that the 1977 tender offer by Itel was not a "sale or reorganization of the Railroad and property" of the GB & W.

## IV. *Directors' Fiduciary Duties to the Class B Debenture Holders*

Plaintiff's more substantial argument is that the directors of the GB & W violated their fiduciary duty owed to the Class B debenture holders. Plaintiff alleges that the directors breached their duty in two respects. First, plaintiff argues that by failing to pursue Itel's proposal for a sale of assets or statutory merger, the directors breached their duty to protect the interests of the Class B debenture holders and to "insure that the Class B Debenture holders were fully paid for their equity ownership of the GB & W." (Brief in support of plaintiff's motion for interlocutory summary judgment on the issue of liability," filed September 21, 1981, at 22 (hereinafter cited as Plaintiff's Brief)). Second, plaintiff argues that by recommending the Itel tender offer, the directors obtained a premium on the sale of the capital stock held by them, and that the premium represented a payment made for control of the corporation. Plaintiff argues that this constitutes a course of self-dealing in which the directors, for their own benefit, sold a corporate asset, i.e., control of the corporation, at the expense of the Class B debenture holders. *Id.* at 27–41.

Plaintiff has approached the fiduciary duty issue by claiming that the Class B debenture is a debenture in name only, and that it actually occupies the same position as that occupied by common stock in an ordinary capital structure. Plaintiff claims that this was the holding of the Wisconsin Supreme Court in *Biltchik v. Green Bay & Western Railroad,* 250 Wis. 177, 26 N.W.2d 633, *cert. denied* 332 U.S. 835, 68 S.Ct. 216, 92 L.Ed. 408 (1947), and that *Biltchik* is *res judicata* in this action. Since the Class B debenture holders are in reality the common stockholders of the GB & W, plaintiff concludes that the directors of the GB & W owe the Class B debenture holders all of the usual fiduciary duties that directors owe to stockholders of their corporation.

Defendants similarly approach this issue by arguing that the Court should categorize the Class B debenture, except the defend-

ants argue that the debenture should be classified as an income bond. Defendants also claim that *Biltchik* is *res judicata* on this issue. At oral argument, defendants referred to the decision of the trial court in *Biltchik,* which stated that the Class B debentures were income bonds. The result of the trial court decision was upheld by the decision of the Wisconsin Supreme Court.

This Court rejects the categorization approach. The bundle of rights held by the Class B debentures defies easy classification of the debentures. Thus, such classification does not aid the analysis of what duties the directors owed the Class B debenture holders.

█ The Court also concludes that *Biltchik* is not *res judicata* for purposes of the issues posed in this case. *Biltchik* only decided what rights the Class B debenture holders have to annual income earned by the GB & W. The trial court's reference to the debentures as "income bonds" must be read in this context. Further, although the supreme court stated that "as to distribution on liquidation" the debenture holders were "on the footing of stockholders of an ordinary corporation," this statement was made as an analogy in the context of the Court's conclusion that the increased equity of the GB & W will benefit the Class B debenture holders upon payment on the bonds. The Court was not concluding that the Class B debenture holders enjoyed all the rights of common stockholders, nor that they were the only security holders with an interest in the equity of the GB & W. Rather, the Court was simply observing that by their terms, the Class B debentures are to be paid out of the equity of the company that remains after payment of prior claims and of $600,000 to the Class A debenture holders and $2,500,000 to the capital stockholders.

The better approach is to examine the particular duties that the plaintiff claims the directors owed the Class B debenture holders, and to determine whether such duties are reasonably implied by the existence of corresponding rights held by the Class B debenture holders. This approach is suggested by the following quotation that appears in Plaintiff's Brief at 17:

" * * * [T]o say that a man is a fiduciary only begins the analysis; it gives direction to further inquiry. To whom is he a fiduciary? What obligations does he owe as a fiduciary? In what respect has he failed to discharge these obligations? * * * " *SEC v. Chenery Corp.,* 318 U.S. 80, 85–86, 63 S.Ct. 454, 458, 87 L.Ed. 626 (1943).

That the directors of the GB & W owed *some* duties to the holders of Class B debentures cannot be disputed. The question which the Court now considers is whether the obligations the directors owe the Class B debenture holders as fiduciaries include the obligations claimed by the plaintiff.

A. *Duty to Pursue Itel's Proposal for a Sale of Assets or Statutory Merger*

The plaintiff argues that the directors owed a duty to insure that the holders of Class B debentures would be fully paid for their equity ownership in the GB & W when the GB & W was sold (this assumes that the sale of the common stock is the same as the sale of the GB & W). Since a sale of assets or statutory merger would have led to a larger payment to Class B debenture holders while the tender offers provided for a lesser payment, plaintiff concludes that the directors owed a duty to negotiate with Itel about Itel's proposal for a sale of assets or statutory merger.

█ Plaintiff seems to assert two bases for this duty. First, Plaintiff's Brief at 25 states:

" * * * The Board of Directors, as the managing body of the GB & W, was required to exercise business judgment and to react favorably to the Itel offer to purchase the assets of the railroad, because the provisions of both the Articles of Incorporation and the Class B Debentures contemplated that upon a transfer of control of the railroad, its property and assets, the Class B Debenture holders would be paid fully for their equitable ownership of the railroad."

This contention cannot be maintained. As explained in part III of this decision, the payment to the holders of Class B debentures was not to be made upon any transfer of control of the railroad but only upon a "sale or reorganization" of the railroad. Nothing in the articles of incorporation or the debentures required that the directors bring about a "sale or reorganization" whenever an opportunity for such arose, or that the directors prefer a "sale or reorganization" to a tender offer.

The other basis that plaintiff asserts for imposing this duty on the directors is the *Biltchik* case. Plaintiff argues that *Biltchik* found that the Class B debenture is in effect the true common stock of the GB & W. As stated above, this Court does not so read *Biltchik*. Whatever the exact interest of the Class B debenture holders in the equity of the GB & W upon a "sale or reorganization," the debentures cannot be equated to common stock.

Nonetheless, because the payment of the debentures on "sale or reorganization" is to be made from the equity of the GB & W, the defendants admitted at oral argument that the directors would owe the debenture holders a duty to properly manage the assets of the corporation so that payment could be made upon a "sale or reorganization." But the plaintiff asserts a broader duty to generally protect the interests of the Class B debenture holders, apparently in preference to the other security holders. The Court cannot find such a duty.

While most corporations operate primarily to benefit those who in the end "own" the corporation, the common stockholders, the GB & W was not designed to pursue the interests of the Class B debenture holders, whatever their interest in the equity of the GB & W. The history of the 1896 reorganization indicates that the "GB & W's structure of priority and control was adapted entirely to protect the investment of the holders of the capital stock and Class A Debentures." (Plaintiff's Brief at 19.) This was the conclusion of the *Biltchik* court and is admitted by the plaintiff. For this reason, the Class B debenture holders were given no control over the corporation. The bonds were offered to give some hope of eventual recovery to the stockholders and second mortgage bondholders of the Green Bay, Winona & St. Paul Railroad Company, who would have recovered nothing had that railroad been foreclosed.

Thus, the directors owed the Class B debenture holders no duty to negotiate a sale of assets or statutory merger in preference to a tender offer in which the Class B debenture holders would receive less. The tender offer presented the Class B debenture holders with the opportunity to sell their debentures at an attractive price, albeit one less than they would have received had a "sale or reorganization" taken place. By refusing to sell the debentures, the debenture holders fully retained whatever right they had to payment from the equity of the GB & W in the event of a "sale or reorganization." They have no right to complain that the directors did not act in the best interest of the Class B debenture holders because the structure of the GB & W was not designed to promote their best interests.

### B. Duty to Avoid Self-Dealing and Obtaining a Premium for Sale of Control

The successful Itel tender offer that the directors of the GB & W recommended on December 14, 1977, offered $330 per share of capital stock. Plaintiff contends, and defendant McGee admitted in his deposition of July 27, 1981, Exhibit 20 of Douglas A. Woodard's affidavit in support of plaintiff's motion for interlocutory summary judgment, filed September 21, 1981, that the market price of the GB & W capital stock never exceeded $100. The difference, plaintiff argues, is a premium which was paid for control of the corporation and which must be distributed to the Class B debenture holders *pro rata*.

In support of its argument, the plaintiff cites a number of cases that stand for the proposition that when majority shareholders of a company or the officers or directors of the company utilize their position of con-

trol to benefit themselves at the expense of the corporation or the minority shareholders, that benefit may be recouped by the corporation or minority shareholders. See Plaintiff's Brief at 31–39. The principle which is at stake is summarized in a quote contained in Plaintiff's Brief at 32 n. 10:

> " 'If a purchaser interested in acquiring control of a corporation's business or its assets approaches the corporation's directors and officers and offers to buy the corporation's assets or acquire it by merger or consolidation, and if the negotiations evolve into a sale by the directors and officers of a controlling block of the corporation's stock at a premium; the sellers may be required to account to the corporation for the premium or to divide it with the other shareholders on the theory that the sellers have diverted a favorable corporate opportunity to sell assets or merge or that they have unfairly frustrated corporate action which, if consummated, would have benefited all shareholders in proportion to their holdings.' F. O'Neal, *Oppression of Minority Shareholders* 194 (1975) (footnote omitted)."

Plaintiff summarizes the cases it cites by concluding that as a general rule, majority shareholders may receive a premium for the transfer of control but that this general rule does not apply when two "indicia of unfairness" are present: "first, the prospective purchaser was interested only in acquiring the assets of the target corporation; and second, the purchaser paid a premium to acquire control of the assets which was wrongfully pocketed by the majority, at the expense of the minority." (Plaintiff's Brief at 39.) Plaintiff asserts that these indicia are present in this case.

■ The Court cannot accept plaintiff's conclusion that any premium the capital stockholders of the GB & W received for transfer of control must be disgorged. In all the cases cited by plaintiff, recovery was sought by the minority shareholders in the corporation and the award was based on their rights as minority shareholders. The holders of the Class B debentures cannot be

said to be the minority shareholders of the GB & W.

Plaintiff's claim that the Class B debenture holders are actually minority shareholders of the GB & W rests on plaintiff's conclusion that *Biltchik* found the Class B debentures to be the common stock of the GB & W. The Court does not accept this reading.

However, since the Class B debenture holders have some interest in the equity of the GB & W, and since they have no right to control the corporation, plaintiff concludes they are in the position of minority shareholders. The difficulty with this argument is that the Class B debenture holders cannot claim that the capital stockholders sold control in the corporation at the expense of the Class B debenture holders when the debenture holders have absolutely no claim to the control of the corporation. In *Dunnett v. Arn,* 71 F.2d 912, 919 (10th Cir.1934), cited by the plaintiff, the Court stated that "it was the duty of [the officers of the corporation] to arrange such sale so that all the stockholders would be afforded the opportunity to share in the proceeds of such sale proportionately according to their stock holdings." This quotation indicates that the duty imposed on majority shareholders not to obtain a premium for sale of control of the corporation is grounded on the notion that all shares are entitled to equal rights.

In this case, the Class B debentures do not have the same rights as the capital stock. The corporation was organized in such a way as to benefit the capital stockholders and the Class A debenture holders. All rights to control the corporation were vested in the capital stockholders. The Class B debenture holders cannot now object that the capital stockholders sold their shares at a price that included a payment for a right that the capital stockholders enjoy and the Class B debenture holders do not.

The importance of this distinction can be demonstrated by an examination of the two cases relied on by the plaintiff that the Court finds factually the closest to the

present case. In the leading case of *Perlman v. Feldmann*, 219 F.2d 173 (2d Cir.), *cert. denied* 349 U.S. 952, 75 S.Ct. 880, 99 L.Ed. 1277 (1955), plaintiffs, minority shareholders of Newport Steel Corporation, sued Feldmann, the president, board of directors chairman, and majority shareholder of the corporation, to recoup a premium Feldmann had obtained for the sale of his controlling interest in the corporation. A purchasing syndicate was interested in buying more steel from Newport than they had been able to obtain during the recent periods of tight supply. Rather than trying to use this market leverage to benefit the corporation, Feldmann sold his controlling shares to the syndicate for $20 per share when the over-the-counter price had not exceeded $12 per share.

The Court held that Feldmann, as a corporate officer and majority shareholder, had not lived up to the duty he owed to the corporation and minority shareholders as a fiduciary. The Court reasoned:

> " * * * We have here no fraud, no misuse of confidential information, no outright looting of a helpless corporation. But on the other hand, we do not find compliance with that high standard which we have just stated and which we and other courts have come to expect and demand of corporate fiduciaries. * * * The actions of defendants in siphoning off for personal gain corporate advantages to be derived from a favorable market situation do not betoken the necessary undivided loyalty owed by the fiduciary to his principal." 219 F.2d at 176.

If the holders of Class B debentures were the minority shareholders of the GB & W, *Perlman* would be strong support for their position in this suit. However, *Perlman* allowed recovery because the corporation was to be run to benefit all shareholders equally. The Court stated: "[s]uch personal gain *at the expense of his coventurers* seems particularly reprehensible when made by the trusted president and director of his company." 219 F.2d at 178 (emphasis added). The holders of the Class B debentures cannot be called the "coventurers" of

the directors and capital stockholders because the debenture holders had no right to control the GB & W and the capital structure of the GB & W was designed so that the corporation would operate to benefit the capital stockholders and the Class A debenture holders, not the Class B debenture holders. Thus *Perlman* is not applicable in this case.

The second case that merits discussion is *Zahn v. Transamerica Corp.*, 162 F.2d 36 (3d Cir.1947). The common stock of the Axton-Fisher Corporation was of two types: Class A and Class B. The Class A stock was convertible into Class B stock at the option of the holder, and was callable by the corporation at any quarterly dividend date upon 60 days' notice at $60 per share plus accrued dividends. The Class B stock initially had all voting rights, but if there were four successive defaults on the payment of dividends to another class of stock, that other class acquired equal voting rights. Because of this provision, the Class A stock had had voting rights equal to the Class B stock since 1937. The Class A stock was entitled to twice the annual dividend of the Class B stock and was entitled to receive twice as much per share as the Class B stock upon liquidation.

By March of 1943, Transamerica Corporation had become the dominant shareholder of the corporation, holding 66⅔% of the outstanding Class A stock and 80% of the Class B stock. The principal asset of the corporation was leaf tobacco that had cost $6,361,981 but now had a market value of $20,000,000. To obtain for itself most of the gain on the value of the tobacco, Transamerica devised a scheme whereby the board of directors of Axton-Fisher, which was dominated by Transamerica representatives, would redeem the outstanding Class A stock for $80.80 per share. Shortly thereafter Transamerica caused the liquidation of the corporation. If allowed to participate in the assets of the corporation upon liquidation, the Class A stock would have been worth $240 per share. The Third Circuit held that Transamerica had violated its

fiduciary duty owed to the holders of the Class A stock.

Unlike the holders of the Class B debentures of the GB & W, the Class A stockholders in Zahn were the actual common stockholders of the corporation. They were entitled to vote upon the occurrence of four successive defaults or upon conversion to Class B stock. In this sense, the corporation was run for the benefit of the Class A stockholders, and they were entitled to participate in the control of the corporation. The Class B debenture holders of the GB & W have absolutely no claim to participate in the control of the GB & W, and they still have whatever rights they had prior to the tender offer to participate in the remainder after a "sale or reorganization of the Railroad and property of said company."

Thus this Court concludes that the defendants owed the plaintiff class no duty to not obtain a premium for the sale of the capital stock of the GB & W, representing payment for control of the corporation.

THEREFORE, IT IS ORDERED that:

1. Plaintiff's motion for interlocutory summary judgment on the issue of liability is denied.

2. Defendants' motion for summary judgment is granted, and this action is dismissed.