CAREY, Respondent, v. RATHMAN and another, Coexecutors of the Estate of Louis Rathman, Deceased, Appellants.

*No. 203. Argued September 12, 1972.—Decided October 3, 1972.*
(Also reported in 200 N. W. 2d 591.)

For the appellants there were briefs by *Brady, Tyrrell, Cotter & Cutler,* attorneys, and *Elwin J. Zarwell, Samuel J. Recht* and *Michael J. Spector* of counsel, all of Milwaukee, and oral argument by *Mr. Spector.*

For the respondent there was a brief by *Quarles, Herriott, Clemons, Teschner & Noelke,* attorneys, and *L. C. Hammond, Jr.,* and *Harold P. Southerland* of counsel, all of Milwaukee, and oral argument by *Mr. Hammond.*

HALLOWS, C. J.   When the agreement was entered into on March 12, 1963, Jean A. Carey was secretary and treasurer of the insurance company and Louis Rathman was the chief executive officer and substantial shareholder. In 1965 Rathman requested all the shareholders to exchange each share of their stock in the insurance company for 3.2 shares of the holding company, which they did.[2]   At that time Carey owned 100 shares and five other shareholders including Rathman owned 17,388 shares. On April 22, 1967, the board of directors declared a stock dividend on the common stock of the insurance company, which amounted to a fractional .42 share on each outstanding share of stock. On April 28, 1967, the insurance company declared a cash dividend of $1 per share. After Carey exercised her option, Louis

[2] It should be noted the agreement each shareholder signed, authorizing the exchange of shares, was conditioned upon all other shareholders of the insurance company executing like authorization with respect to all their shares, with the exception of qualifying directors' shares.

Rathman obtained 1,000 shares of the insurance company stock which he considered he was obligated to deliver under the contract from the holding company. He was then president and director of the holding company and met with the other directors. They agreed the holding company would accept Carey's check of $24,000 in exchange for the 1,000 shares of insurance company stock which it owned. Rathman thereupon negotiated Carey's check to the holding company which transferred directly to Carey 1,000 shares of insurance company stock. As a result of this transaction Louis Rathman claims he fulfilled his obligations under the stock-purchase agreement.

The second paragraph entitled "Dilution" of the stock-purchase agreement [3] provided, in part, that in the event there was a recapitalization or exchange of shares or

[3] "2. **Dilution.** In the event there shall be at any time during said five-year period a stock dividend in shares of common stock of Association Insurance Company, Inc., or in any other class of shares of Association Insurance Company, Inc., or in the event there shall be at any time during said period a recapitalization or exchange of shares or other reorganization of the capital structure of Association Insurance Company, Inc., or a merger or consolidation with another company or companies, then in any such event, with respect to the then unexercised right to purchase shares of Association Insurance Company, Inc., under this contract, Jean A. Carey, or the executor, administrator or personal representative of her estate shall have the added right to purchase or acquire such additional or substituted shares of stock or other securities as she would have received had she been a holder and owner of the shares subject to the then unexercised right to purchase hereunder at the time of such event. The price to be paid for all of such shares of common stock and such additional and/or substituted securities or shares of stock shall be $24.00 times the number of shares of Association Insurance Company common stock then subject to the unexercised portion of this option contract, plus such consideration per share as other holders of common stock may be obligated to pay upon such recapitalization, exchange, reorganization or merger."

other reorganization of the capital structure of the insurance company, then Carey would have the additional right to purchase or acquire such additional or substituted shares of stock or other securities as she would have received had she been a holder of the shares subject to her unexercised right to purchase under the contract. The basic issue on appeal is whether Carey is entitled under the provisions of the dilution paragraph of the contract to the 3,200 shares of holding-company stock which were exchanged for 1,000 shares of the insurance company stock held by Louis Rathman and subject to the contract. The determination of this issue depends upon the intent of the parties to the contract as expressed in the agreement.

The general rule of interpretation of a contract is to determine the intent from the instrument as a whole and not necessarily from isolated or particular parts thereof. *Langer v. Stegerwald Lumber Co.* (1951), 259 Wis. 189, 47 N. W. 2d 734. The meaning of particular parts or words in a contract should be determined in light of and consistent with the general purpose of the agreement. *State ex rel. Department of Agriculture & Markets v. Badger Dairy, Inc.* (1944), 245 Wis. 229, 14 N. W. 2d 34. Since language in written instruments derives its meaning from its use in reference to other language and the general purpose sought to be expressed, the specific phrases and words must be considered in relation to the nature and the object of the transaction and read in light of other provisions of the contract and of the circumstances surrounding its execution. *Marshall & Ilsley Bank v. Greene* (1938), 227 Wis. 155, 278 N. W. 425. This is a familiar rule of construction, not only in contracts but in wills. *Estate of Breese* (1959), 7 Wis. 2d 422, 96 N. W. 2d 712.

In ascertaining the meaning of a contract, the court may look to the consequences which would result should

it adopt one construction as opposed to another, because where there is ambiguity the more reasonable meaning should be given on the probability that persons situated as the parties were would be expected to contract in that way as opposed to a way which works an unreasonable result. *Wisconsin Employment Relations Bd. v. Gateway Glass Co.* (1953), 265 Wis. 114, 60 N. W. 2d 768. While a court cannot engage in equitable redrafting of contracts, a construction which makes a contract reasonable, fair and just will be given over one making the contract unusual or extraordinary, if equally consistent with the language used. *Bank of Cashton v. La Crosse County Scandinavian Town Mut. Ins. Co.* (1934), 216 Wis. 513, 257 N. W. 451.

Stock-option contracts given to employees generally favor them in the purchase of stock to motivate them to remain as employees and to increase efficiency in performance. The stock option is to encourage key employees. Since a stock option generally runs for a period of time, it is customary, as in this case, to protect the economic value of the option by including a clause which will give the employee substantially the same or greater economic benefit offered by the option over the period of time.

In the construction of a contract, a court may look to the actions of the parties to see what construction they have placed upon the ambiguous contract. However, the cases involving construction through subsequent acts of the parties generally present situations where one party acts one way and the other party does nothing inconsistent therewith. *Berger v. Alan Realty Co.* (1956), 273 Wis. 427, 78 N. W. 2d 747. In the instant case, the acts of the parties indicate opposite constructions. Carey tentatively accepted 1,000 shares of the insurance company stock and asked for the additional 429 shares in her complaint—not until seventeen months later did

she ask for 3,200 shares of the holding-company stock. On the other hand, Louis Rathman in 1965 exchanged his insurance company stock (1,000 shares of which he held subject to the contract) for holding-company stock and only by virtue of the fact he controlled the holding company was he able to get the holding company, in effect, to take over his contract with Carey. Rathman's actions would indicate, at least that in 1965 when he exchanged his insurance company stock for the holding-company stock, he believed he could fulfill his contractual obligation by tendering holding-company stock, unless we are to conclude he intended at that time to breach his contract. Thus the acts of the parties seem to neutralize each other and require this court to look elsewhere to determine their intent, as was necessary in the case of *Hicks Printing Co. v. Wisconsin Central Ry. Co.* (1909), 138 Wis. 584, 120 N. W. 512.

It is contended by Carey the disputed paragraph provides for six possibilities—stock dividends of either common or any other class of stock of the insurance company, recapitalizations, exchanges of stock, other reorganizations of capital structure, mergers, and consolidations. Rathman on the other hand argues there are three classifications, each beginning with the article "a," to wit: (1) A stock dividend of common stock or other class of shares of the insurance company, (2) a recapitalization or exchange of shares or other reorganization of capital structure, or (3) a merger or consolidation with another company. He argues the word "other" before "reorganization of capital structure" in the second phrase qualifies the phrase "exchange of shares," thus limiting it to exchanges involved in recapitalizations. It is argued an exchange of shares may or may not result in a reorganization of the capital structure and the parties intended by the word "other" to

include only such exchange of shares which involved a reorganization of the capital structure.

This construction assumes the parties by placing the phrase "exchange of shares" before the word "other" intended that phrase to be so modified. This is not necessarily so. The parties may well have considered all exchanges of stock to be a reorganization of capital structure and the two phrases substantially synonymous, as is recapitalization. Or, the parties could have intended the phrase to mean all exchanges whether they involved a change in capital structure or not. We think the enumeration read in the light of the general purpose of the contract shows the parties intended any kind of exchange of stock. This meaning is enhanced by the last phrase of the paragraph. The last sentence deals with the price of the stock in certain events and the six or three contingencies are reduced to four, namely, recapitalization, exchange, reorganization, or merger. This would indicate "exchange" was made broader in its meaning than contended by Rathman and not restricted to a particular kind of reorganization. We must remember the contract was drawn up on behalf of Rathman, not Carey, and should be construed against him. *Wisconsin Employment Relations Bd. v. Gateway Glass Co.* (1953), 265 Wis. 114, 60 N. W. 2d 768. Rathman engineered the exchange of stock in 1965 and it is not likely it was contemplated Carey was to become the sole minority stockholder of the insurance company.

It is urged the rules of *noscitur a sociis* and *ejusdem generis* should be used in the construction of this paragraph; but as applied by the parties, each party comes to a different conclusion. These rules are only aids to construction, that is, to determine what the intent of the parties was by the use of the words they used. *First Wisconsin Trust Co. v. Perkins* (1957), 275 Wis. 464, 82 N. W. 2d 331; *Boardman v. State* (1930), 203 Wis. 173, 233 N. W. 556.

These rules are not to be applied arbitrarily or where they may restrict or be inconsistent with a broader intent gleaned from the general purpose of the contract and the circumstances surrounding the contract's execution.

We think the trial court was correct in its interpretation which places Carey in the position she would have been had she exercised the contract in the earlier part of the five-year period rather than in the latter part. In 1965 she exchanged her 100 shares of insurance company stock for 320 shares of holding-company stock. There is no reason to believe she would not have exchanged the 1,000 shares if she was then owner, as Rathman did. This is a reasonable and a fair construction and should prevail.

We need spend only a little time with the question of whether Carey is entitled to 429 additional shares of the insurance company stock and to the dividend of December 28, 1967, because these two items are moot since Carey is entitled to 3,200 shares of the holding-company stock as a substitution for the 1,000 shares of the insurance company stock mentioned in the option-purchase contract. Besides, there is no merit to the contention Carey should pay for the stock-dividend shares.

*By the Court.*—Judgment affirmed.