John JACKMAN, Plaintiff-Appellee,

v.

**WMAC INVESTMENT CORPORATION,**
**Defendant-Appellant.**

No. 85–1710.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 13, 1985.

Decided Jan. 9, 1987.

Rehearing Denied Feb. 20, 1987.

**378**

Gilbert W. Church, Foley & Lardner, Leonard G. Leverson, Milwaukee, Wis., for defendant-appellant.

Terry E. Nilles, Gibbs, Roper, Loots & Williams, Milwaukee, Wis., for plaintiff-appellee.

Before CUMMINGS and CUDAHY, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

ESCHBACH, Senior Circuit Judge.

This diversity case concerns the interpretation under Wisconsin law of a stock incentive plan for employees. Plaintiff brought suit to recover money which he claimed was due to him under the plan. Defendant had refused to pay, arguing that plaintiff had forfeited his rights under the plan by leaving the company. Ruling on a motion *in limine*, the trial court interpreted the plan to provide that plaintiff was entitled to the payments he sought and held that defendant could not introduce parol evidence that the parties intended differently in making the plan. Agreeing that the ruling effectively determined the outcome of the case, the litigants entered into a stipulation to avoid the need for trial and to enable defendant to appeal. The stipulation provided that if the court's ruling on the motion *in limine* was correct, judgment should be granted to plaintiff. The stipulation did not settle the additional issue of whether plaintiff should also be granted attorney's fees under the Wisconsin Wage Claim statute, leaving that issue for the court to decide. The trial court entered judgment for plaintiff on the basis of the stipulation and granted attorney's fees to plaintiff. We have jurisdiction under 28 U.S.C. § 1291.

Defendant advances two arguments on appeal. Defendant asserts error in the district court's ruling that the defendant could not present extrinsic evidence or argument concerning the parties' intent in entering into the stock incentive plan. Defendant also argues that the district court erred in awarding attorney's fees under the Wisconsin Wage Claim statute, both by treating the award as mandatory, where the statute makes it a discretionary decision, and by failing to give an adequate basis for the award. For the reasons stated below, we will affirm on both the granting of the motion *in limine* and the award of attorney's fees.

## I.

The essential facts are undisputed. Plaintiff John Jackman was employed by defendant MGIC Investment Corporation (which has since changed its name to WMAC Investment Corporation) as a vice president. In early 1981, his 1980 job performance evaluation was negative and he was told to look for another job. During the rest of 1981 MGIC gradually removed virtually all his job responsibilities. Jackman repeatedly requested a new job within MGIC. Toward the end of the year MGIC offered and he accepted a new job as vice

president of a subsidiary, at about one half his former salary.

Jackman retained his rights in MGIC's "1979 Restricted Stock Performance Plan" ("1979 Plan"). Under the 1979 Plan, participant employees were awarded "Restricted Stock" of MGIC. The stock remained "restricted," meaning the employee's rights in it did not vest until the end of a period set by the company at the award of the stock, the "Restricted Period." If the employee was fired or quit, he forfeited all rights in stock that had been awarded to him that was still restricted.

An exception to the complete forfeiture rule was that if the termination was due to the employee's death or retirement, a portion of the stock, corresponding to the part of the "Restricted Period" for that stock that had elapsed, vested and the remaining portion was forfeited. For example, an employee might receive 200 shares of restricted stock in August, 1975, with a "Restricted Period" of four years. If he was still with the company in August 1979, the stock would become unrestricted, meaning he would now own 200 shares of common stock. If he left the company before August of 1979, for any reason other than death or retirement, he would forfeit the stock. If he retired in August of 1977, halfway through the "Restricted Period," he would receive 100 shares and forfeit his rights in the other 100. Holding restricted stock, then, was an incentive for the employee to remain with the company. Jackman had a total of 900 shares of such restricted stock at the time of the events discussed here.

On December 13, 1981, MGIC announced that it would be acquired by Baldwin-United Corporation ("Baldwin"). The merger was completed on March 2, 1982.

After the announcement of the merger but before its consummation, Baldwin announced a replacement stock plan, the "1982 Deferred Compensation Plan" ("1982 Plan"), that would take effect upon the consummation of the merger. The 1982 Plan was substantially similar to the 1979 Plan, with the following differences. Under the 1982 Plan, participants would receive cash rather than stock upon the vesting of restricted stock. The 1982 Plan also introduced a feature advantageous to participants, the "Non-Forfeiture Termination."

"Non-Forfeiture Termination"—means the termination of a Participant's employment with the Company, Baldwin-United or any Baldwin-United subsidiary or parent immediately after which termination the Participant is not an employee of the Company, Baldwin-United or any Baldwin-United subsidiary or parent, if such termination is (1) as a result of the death or permanent disability of the Participant, (2) made by the Participant's employer other than for cause, or (3) made by the Participant as a result of a material diminution by the Participant's employer in the Participant's job responsibilities.

A participant whose employment ended through a "Non-Forfeiture Termination" did not forfeit his rights in any restricted stock, as he would have under the 1979 Plan for any termination other than one due to his death or retirement. In fact, the vesting was accelerated, and the employee became entitled to the full cash payment five days after termination. Thus, an employee holding restricted stock under the 1982 Plan stood to receive cash for it unless he was fired for cause or quit for any reason other than a "material diminution" in his job responsibilities by his employer. In February, 1982, Jackman signed an agreement to participate in the 1982 Plan.

About three months after the merger, Jackman left MGIC and took employment elsewhere. He requested the cash payment due for 900 shares, on the basis that he fell into the third category of "Non-Forfeiture Termination," a termination "made by the Participant as a result of a material diminution by the Participant's employer in the Participant's job responsibilities." MGIC refused payment, stating that non-forfeiture was not applicable in Jackman's case because the "material diminution" in

his duties had occurred before the time of the merger.

After bringing suit on April 1, 1983, Jackman filed a motion *in limine* to exclude extrinsic evidence and argument about the purpose and intent of the 1982 Plan. MGIC opposed the motion, seeking to adduce such evidence and argument to demonstrate that a "Non-Forfeiture Termination" could not be based on a "material diminution" of an employee's job responsibilities that occurred before the effective date of the merger. The trial court granted the motion, holding the provision to be neither patently nor latently ambiguous. In interpreting the 1982 Plan to decide on the motion, the court held that the provision applied to "material diminutions" made before or after the merger, thus rejecting MGIC's proffered interpretation as a matter of law.

To enable appeal, the parties stipulated that, if the ruling on the motion was correct, Jackman was due a judgment of $47,853 plus interest. MGIC thus waived such possible arguments as that Jackman did not quit as "a result" of the diminution in his responsibilities. The district court entered judgment for Jackman and granted his motion for attorney's fees in the amount of $20,000. 610 F.Supp. 290.

## II.

### Parol Evidence

In Wisconsin, although parol evidence is not admissible to vary the terms of a complete and unambiguous contract, such extrinsic evidence is admissible to aid interpretation of ambiguous contract language. *Marshall & Ilsley Bank v. Milwaukee Gear Co.*, 62 Wis.2d 768, 216 N.W.2d 1, 5 (1974). Such ambiguity may appear on the face of the contract or it may appear only as the contract applies to its subject matter. 216 N.W.2d at 7.

For ambiguity to appear on the face of a writing, the language must be reasonably susceptible of more than one meaning. *Jones v. Jenkins*, 88 Wis.2d 712, 277 N.W.2d 815, 819 (1979).

A word or term in a contract to be ambiguous must have some stretch in it— some capacity to promote more than one meaning—before parol evidence is admissible.

*Conrad Milwaukee Corporation v. Wasilewski*, 30 Wis.2d 481, 141 N.W.2d 240, 244 (1966). The simplest type of ambiguity exists when a phrase or word, in and of itself, is susceptible of multiple meanings. For example, the phrase "in the event there shall be a ... recapitalization or exchange of shares or other reorganization" can be read to refer to all exchanges of shares or only to exchanges of shares that occur as part of a reorganization. *Carey v. Rathman*, 55 Wis.2d 732, 200 N.W.2d 591, 594 (1972). The phrase at issue here, however, "material diminution by the Participant's employer in the Participant's job responsibilities," is not of itself ambiguous, since it clearly lacks any requirement that the "material diminution" must occur after the date of the merger. MGIC argues that, although the clause is not so limited expressly, when read in light of the other provisions of the plan, it evinces the intent to have such a limitation or at least becomes ambiguous. Because determining that the writing is unambiguous involves finding the single correct interpretation, we will address these arguments together.

Ambiguity in one clause of the document can indeed appear when the language is read in light of the other provisions. There was ambiguity due to an "inherent conflict" between two contract clauses, where one stated a right existed as long as warrant stock was held but the other stated that the right existed only as long as certain notes or warrants were outstanding. *Capital Investments, Inc. v. Whitehall Packing Company, Inc.*, 91 Wis.2d 178, 280 N.W.2d 254 (1979). This court, applying Wisconsin law, found ambiguity where two clauses, although not necessarily inconsistent, made the performance promised unclear. *Fidelity and Deposit Company of Maryland v. City of Sheboygan Falls*, 713 F.2d 1261, 1271–72 (7th Cir.1983). In *Fidelity*, one clause specified the equip-

ment to be used, another clause suggested that one party guaranteed the equipment's efficacy for the task, although the party had no say in its choice. Parol evidence was admissible to show whether he had indeed made such a guarantee.

In *Worth v. Kelley Company, Inc.*, 22 Wis.2d 318, 126 N.W.2d 75 (1964), the court found apparently unlimited language to be limited when read in light of other provisions. One clause prohibited the lessees in *Worth* from removing any equipment from the property. But the remainder of the clause governed the rights of the parties in the event of default under the lease and another clause granted the lessee the right to remove equipment. Read in that context, the language in question clearly prohibited only the removal of equipment after default.

In this case, MGIC argues that, when read in light of the rest of the contract, the non-forfeiture clause covers only events that occur after the merger. MGIC argues that, because the clause only applies to terminations that occur after the merger, the entire clause should be read only to refer to the type of events in the clause if they also occur after the merger. If that argument is accepted, then non-forfeiture protection would not apply to an employee, such as Jackman, who quit as the result of a "material diminution" in his job responsibilities where the "material diminution" was made before the merger.

But MGIC's argument ignores the reasons that the clause does not apply to pre-merger terminations. The clause would not apply to a pre-merger termination because an employee terminated before the merger would not fit under the 1982 Plan's definition of "Participant." In order to be a "Participant" in the 1982 Plan, an employee had to have been a participant in the 1979 Plan at the time the 1982 Plan went into effect, which was the time of the merger. If the employee had been terminated before the merger, he would no longer be a participant in the 1979 Plan and thus could not be a "Participant" in the 1982 Plan. Since the non-forfeiture clause applies only to participants in the 1982 Plan, only terminations occurring after the merger could be covered by the clause.

But an employee would remain a 1979 participant after a "material diminution." So the reason that the clause does not apply to pre-merger terminations is not applicable to pre-merger "material diminutions." The 1982 Plan contains no clause expressly excluding employees terminated before the merger from non-forfeiture protection, they were simply not with the company when the 1982 Plan went into effect. Once the plan was in effect, it extended non-forfeiture protection to all terminations which met certain conditions. The plan places no temporal limitations on those conditions.

We note also that in several other places the 1982 Plan carefully addresses matters of time. The "Non-Forfeiture Termination Date," "Closing Date" and "Effective Time" are defined. A "Disinterested Person" cannot have been a participant at the time of the exercise of discretion or within the prior year. "Participants" are narrowly defined as those who were participants in the 1979 Plan immediately prior to the effective date of the 1982 Plan. Other provisions reflect careful attention to exactly when rights under the plan accrue or are lost. Such provisions suggest that when the parties intended to have time limitations, they made them clear.

■ In summation, the 1982 Plan as drafted introduces non-forfeiture protection for any employee who quits as a result of "material diminution" in his job responsibilities. The plan makes non-forfeiture protection available as of the effective date of the plan. There is nothing in the language of the plan to indicate that the parties intended to deny non-forfeiture protection when the "material diminution" occurred before the effective date. Since the plan is not reasonably susceptible of the reading that MGIC proposes, it is not ambiguous.

Having determined that the plain language of the non-forfeiture clause applies to "material diminutions" occurring both

before and after the merger, we next determine whether the specific language regarding "material diminutions" becomes ambiguous when considered with reference to the underlying purposes of the contract. "The meaning of particular parts or words in a contract should be determined in light of and consistent with the general purpose of the agreement." *Carey v. Rathman*, 55 Wis.2d 732, 200 N.W.2d 591, 594 (1972); *see also Frandsen v. Jensen-Sundquist Agency, Inc.*, 802 F.2d 941 (7th Cir.1986) (where contract as drafted serves a viable purpose, the fact that it did not serve another possible purpose did not make its language ambiguous). The inquiry here is whether, in light of the underlying purposes of the 1982 Plan, the plan's reference to "material diminution" is reasonably susceptible of a reading that it refers only to a "material diminution" that occurs after the merger. The purposes of the plan discussed here are apparent from the plan itself. Parol evidence would be admissible only to explain existing ambiguity, not to create it. *Marshall & Ilsley Bank v. Milwaukee Gear Co.*, 62 Wis.2d 768, 216 N.W.2d 1, 5 (1974).

In this case, MGIC argues that to be consistent with the purpose of the 1982 Plan, the phrase "material diminution" must be read to refer only to "material diminutions" occurring after the merger. According to this argument, the plan was implemented to give employees an incentive to remain with the company after the merger, but applying non-forfeiture protection to Jackman would have given him an incentive to leave the company, since he would receive accelerated payment for his restricted stock.

However, the plan also served to provide employees with an incentive to remain with the company by relieving the anxieties caused by the merger announcement. Under the 1979 Plan, in effect at that time, an employee did not control whether he remained employed long enough for his stock to vest, since the employer could terminate him for any reason and cause forfeiture. By shifting control to the employee through the introduction of "non-forfeiture termination," the 1982 Plan gave employees reason to believe that their jobs were not threatened by the merger. Employees at the time of the merger often hear little solid information and many rumors. By introducing a plan under which an employee who was fired without cause or who left as a result of a "material diminution" did not forfeit his restricted stock, MGIC reassured employees. That would reduce feeling on the part of the employees that the merger was a threat to their jobs or job responsibilities.

More specifically, if the plan denied non-forfeiture protection to any employee who quit as a result of pre-merger "material diminution," employees could fear that the events surrounding the upcoming merger might result in a diminution of their job responsibilities. They would then be left with the choice of either quitting and forfeiting their stock or remaining in the diminished job. If, however, the 1982 Plan provided that such an employee received non-forfeiture protection, employees would be less fearful of such events.

■ To summarize, the 1982 Plan is not reasonably susceptible of any reading other than that it provides non-forfeiture protection to an employee who quits as a result of a "material diminution," whether the "material diminution" occurs before or after the merger. Therefore, since the plan was not ambiguous on its face, the trial court was correct in excluding parol evidence offered to vary or contradict its terms.

Wisconsin also recognizes the "latent ambiguity" doctrine, under which ambiguity can appear as the language of the agreement applies to the subject matter of the agreement. There are two types of situations to which the doctrine applies. In the first, contract language that appears clear on its face actually reveals its ambiguity in light of the surrounding circumstances. For example, an insurance policy identifying the subject matter as the tobacco barn at a certain address would seem to be quite clear. Should it transpire, how-

ever, that there are two tobacco barns at that address, then parol evidence would be admissible to aid in the determination of which barn was intended. *Nolan v. Standard Fire Insurance Company*, 243 Wis. 30, 9 N.W.2d 74 (1943).

In this case MGIC argues for application of the other type of latent ambiguity in Wisconsin, which is actually more like mistake or omission than ambiguity. Rather than examination of the underlying facts making more than one reading of the contract reasonable, it shows the literal reading to be suspect.

> The words of a contract, in themselves, may be plain, yet when applied to the situation with which it deals, not plain, the literal sense leading to such unreasonableness as to suggest that the parties probably did not so intend.

*Klueter v. Joseph Schlitz Brewery*, 143 Wis. 347, 128 N.W. 43, 45 (1910). The contract in *Klueter* called for delivery by a particular railroad that did not serve the loading point to be used.

The Supreme Court of Wisconsin relied on *Klueter* in finding latent ambiguity where specifications clear on their face led to a "patently ridiculous situation" when applied to the facts. *Stevens Construction Corporation v. Carolina Corporation, et al.*, 63 Wis.2d 342, 217 N.W.2d 291, 298 (1974).

In this case, application of the agreement as written does not lead to impossibility as in *Klueter*, nor does the contract prove to be silent about an essential duty, as in *Stevens*. Neither "unreasonableness" nor a "patently ridiculous situation" appears here. To extend the protection of non-forfeiture termination to employees who quit as a result of a "material diminution" occurring even before announcement of the merger accords with the purposes of the plan, as discussed above. Baldwin, seeking to calm employee anxiety caused by the merger announcement, made changes in the stock plan favorable to employees. Employees agreed before the merger to participate in the new plan. A plan providing protection in the case of all "material

diminutions" would be more reassuring to employees than one providing protection only if the "material diminution" occurred after the merger. Therefore the judgment for plaintiff was correct.

## III.

### Attorney's Fees

MGIC also attacks the award of $20,000 attorney's fees under the Wisconsin Wage Claim statute, advancing two independent arguments: that the court mistakenly held itself bound to award fees, where the decision is a discretionary one, and that there was an insufficient basis for the court's decision.

The trial court awarded attorney's fees to Jackman on the basis of two affidavits by Jackman's counsel which gave the total hours expended on the case and listed the tasks performed. The court held an oral, non-evidentiary hearing for argument on the motion. The court made written findings in its award.

In diversity cases, state law governs the granting of attorney's fees. *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 259 n. 31, 95 S.Ct. 1612, 1622 n. 31, 44 L.Ed.2d 141 (1975); *Blue Ribbon Feed Company, Inc. v. Farmers Union Central Exchange, Inc.*, 731 F.2d 415, 422 (7th Cir.1984). In Wisconsin, as under federal law, the standard of review of the award of attorney's fees is whether the trial court abused its discretion. The trial court awarded fees under Chapter 109 of the Wisconsin Statutes, "Wage Payments, Claims and Collections."

> 109.03(6) Wage Claim. In an action by an employee against the employer on a wage claim ... the court may allow the prevailing party, in addition to all other costs, a reasonable sum for expenses.

WIS.STAT.ANN. § 109.03(6) (West 1986).

The statute has not been interpreted in any reported decisions. Because Wisconsin has little case law on the issues to be discussed here, we will look also to cases decided under federal statutes, as per-

suasive authority. We note that, for example, fees are awarded to the "prevailing party" under both the Wisconsin statute and 42 U.S.C. § 1988.

■ MGIC does not dispute the applicability of the statute here or the inclusion of attorney's fees in the meaning of "expenses" under the statute. MGIC does contend that the court ignored the statute's discretionary language, "may allow," and awarded fees as a matter of course. However, in its written decision awarding fees, the district court expressly stated, "[T]he Court must consider whether to exercise its discretion to award fees in this case." The court went on to hold that the award of attorney's fees would further the objectives of the statute and that the fees requested were justified.

The trial court should give sufficient reasons to facilitate review of its award. *Cf. Freeman v. Franzen*, 695 F.2d 485, 494 (7th Cir.1982), *cert. denied*, 463 U.S. 1214, 103 S.Ct. 3553, 77 L.Ed.2d 1400 (1983). The court here did explain why it awarded fees and why it chose the particular amount it granted. This is not a case where the court gave no reasons, *id.*, or did not indicate the factors it relied upon. *Ellis v. Flying Tiger Corp.*, 504 F.2d 1004, 1006 (7th Cir.1972).

MGIC also argues that the court lacked a sufficient basis to determine the fees. Plaintiff submitted affidavits indicating that plaintiff's counsel had spent 275 hours, and paralegals 20 hours, on the case. The $20,000 requested thus came to hourly rates of just over $70 for counsel and $25 for paralegals.

■ Affidavits can provide sufficient basis for the award of attorney's fees. "It is not really the type of issue or question of fact where an adversary presentation is necessary to the presentation of evidence necessary to a determination." *Tesch v. Tesch*, 63 Wis.2d 320, 217 N.W.2d 647, 654 (1974) (itemized bill sufficient basis for award of fees).

■ The court below expressly found the time expended reasonable, although the case did not go to trial. Just as the trial court is in the best position to determine whether the hourly rates billed are reasonable. *Standard Theatres, Inc. v. State of Wisconsin*, 118 Wis.2d 730, 349 N.W.2d 661, 671 (1984), it is in the best position to assess the reasonableness of the time counsel devoted to the case. *See State of Illinois v. Sangamo Construction Co.*, 657 F.2d 855, 862 (7th Cir.1981). Where there were only two major tasks, the preparation of a pre-trial report and the filing of a motion *in limine*, and the trial judge found the total hours expended reasonable, we find no abuse of discretion in not requiring a more detailed breakdown.

Finally, MGIC also argues that the court's failure to require a more exact breakdown may have permitted the awarding of fees for time expended on issues that were not litigated. The district court found no basis for such a concern and neither do we.

## IV.

For the reasons stated, the judgment of the district court is

AFFIRMED.