**Axel N. ELIASEN, Robert V. Rollheiser and Allan L. Apter, on behalf of themselves and all others similarly situated, Plaintiffs,**

v.

**ITEL CORPORATION, a Delaware Corporation, Itel Rail Corporation (f/k/a Itel Rail Car Division), a Delaware Corporation, Howard L. Chabner, James Chandler, Rod F. Dammeyer, Jack P. Edwards, Desmond Hayes, William J.**

---

**38.** *Id.* at 65; 117–122.

**39.** *Id.*

**40.** *Id.* at 72–73.

**41.** *Id.* at 75.

**42.** *12N Statement,* Exhibit D; Nimocks Dep. at 34.

**43.** Nimocks Dep. at 45–47.

**44.** *Id.* at 42–43.

**45.** *Id.* at 51.

Herndon, Gary M. Hill, Curtis J. Hocka-
day, Robert C. Kiehnle, James E. Knox,
Paul L. Loveday, Carl V. Lyon, Charles
D. Martin, Samuel Zell, Thomas O.
Kloehn, and Quarles & Brady, Defen-
dants.

No. 94 C 4601.

United States District Court,
N.D. Illinois,
Eastern Division.

April 24, 1995.

Stuart Smith, Christopher L. Gallinari,
Gregory T. Riddle, Gordon & Glickson P.C.,
Chicago, IL, for plaintiffs.

Howard J. Roin, Jonathan L. Marks, Erik
J. Lillya, Walter M. Rogers, Peter J. Dono-
ghue, Mayer, Brown & Platt, Chicago, IL,
for defendants.

## MEMORANDUM OPINION AND ORDER

GETTLEMAN, District Judge.

Plaintiffs, Axel N. Eliasen, Robert V. Roll-
heiser and Allan L. Apter, on behalf of them-
selves and all others similarly situated, bring
this eighty-two page, nine count putative
class action complaint against defendants Itel
Corporation ("Itel"), Itel Rail Corporation
("Itel Rail"), Howard L. Chabner, James
Chandler, Rod F. Dammeyer, Jack P. Ed-
wards, Desmond Hayes, William J. Herndon,
Gary M. Hill, Curtis J. Hockaday, Robert C.
Kiehnle, James E. Knox, Paul L. Loveday,
Carl V. Lyon, Charles D. Martin, Samuel
Zell ("the Individual Defendants"), and
Thomas O. Kloehn and Quarles & Brady,
alleging violations of the federal RICO stat-
ute, 18 U.S.C. § 1962(a), (c), (d); Section
10(b) of the Securities Exchange Act, 15
U.S.C. § 17(j); and state common law claims
of breach of fiduciary duty, tortious interfer-
ence with contract, conversion of property
rights, accounting, as well as a claim for
declaratory judgment. Federal jurisdiction
is based on the RICO counts, 18 U.S.C.
§§ 1964(a), (c), and 28 U.S.C. § 1331. All
defendants have moved to dismiss all counts
pursuant to Fed.R.Civ.P. 12(b)(6) for failure
to state a claim upon which relief can be
granted, and pursuant to Fed.R.Civ.P. 8(a)(2)
and 9(b) for failure to set forth a short plain
statement of the claim and failure to plead
fraud with particularity. For the reasons set
forth below, defendants' motions are granted
and the case is dismissed.

## INTRODUCTION

This is the latest (and hopefully the last) chapter in a long saga involving the rights of the holders of Class B debentures of the Green Bay & Western R.R. Co. ("GB & W"). Plaintiffs are all holders of Class B debentures who claim that pursuant to the wording of the securities issued by GB & W, as well as the Articles of Incorporation, they, as holders of Class B debentures, are entitled to a *pro rata* distribution of the net proceeds of the recent sale of GB & W. Plaintiffs claim that defendants, through a series of schemes, sought to destroy the value of the Class B debentures.

Defendant Itel is a Delaware corporation engaged in various businesses through its subsidiaries. Defendant Itel Rail is a wholly owned subsidiary of Itel that leases rail cars, and manages various short line railroads. In 1983, Itel, which owned 99.9% of the GB & W capital stock and a majority of the GB & W Class B debentures, transferred all of its railroad operation to Itel Rail, including the GB & W capital stock and the GB & W Class B debentures. The individual defendants are all current or past officers and/or directors of Itel, Itel Rail, or GB & W. Defendant Kloehn is an attorney with the Wisconsin law firm of Quarles & Brady ("Quarles"), which plaintiffs allege represented GB & W and Itel at all relevant times, and who were aware of the alleged scheme to defraud the Class B debenture holders and advised and counseled Itel and Itel Rail with respect to many of the alleged wrongful acts.

Plaintiffs claim that as holders of Class B debentures they are the true owners of the equity of GB & W, and that defendants have concocted various elaborate schemes to destroy the value of the Class B debentures such that their actual value never exceeded their face value. To accomplish this goal, plaintiffs allege that defendants developed schemes to: (1) fraudulently deprive the minority holders of Class B debentures of their right to receive payments out of annual net income of GB & W; (2) fraudulently misuse the monies withheld from the Class B debenture holders by "loaning" said monies to Itel; (3) materially decrease the value of the GB & W securities by withholding the payments due out of annual income so that the securities could be purchased at artificially low prices; (4) fraudulently transfer approximately $10 million of GB & W's operating assets' "value" to another railroad owned by Itel, so as to deny the minority Class B debenture holders their full equity value in GB & W; (5) fraudulently deny the minority Class B debenture holders the value of that part of the equity of GB & W to which the Class B debenture holders were entitled, which exceeded the $1,000 face amount of the Class B debentures; (6) fraudulently misrepresent to the Class B debenture holders, the state and federal governments, and state and federal courts through the use of the U.S. mail, the rights of the Class B debenture holders and the value of the Class B debentures in order that Itel could obtain possession of the Class B debentures at prices drastically below the face value; and (7) cause GB & W to lease rail cars from Itel on terms overly favorable to Itel and extremely unfavorable to GB & W, which reduced the annual net income of GB & W, reduced the value of the GB & W, and in turn reduced the value of the Class B debentures.

According to the complaint, in 1993 Itel Rail sold the GB & W assets and property to Wisconsin Central Transportation Corp. ("Wisconsin Central"), along with the assets of the Fox River Valley Railroad ("FRVR"), which was wholly owned by Itel Rail. At the time of the sale, Itel Rail owned 99.9% of the outstanding capital stock of GB & W, but only 78% of the Class B debentures. Plaintiffs allege that from the time Itel acquired GB & W in late 1978, until the time it sold GB & W, Itel sought to destroy the value of the Class B debentures by reducing the value of the GB & W assets. In addition, plaintiffs allege that Itel put into place a scheme to change the nature of the Class B debentures from equity status, which plaintiffs claim they enjoy under *Green Bay & W.R. Co. v. Commissioner of Internal Revenue*, 147 F.2d 585 (7th Cir.1945), and *Biltchik v. Green Bay & W.R. Co.*, 250 Wis. 177, 26 N.W.2d 633 (1947), to debt status.

## BACKGROUND [1]

To understand the nature of plaintiffs' complaint, it is necessary to review the history of GB & W, the history of the Class B debentures, and the history of the litigation surrounding those debentures.

From 1871 through 1873, Green Bay & Lake Pepin Railway Company built the railroad that is the subject of this lawsuit. In 1873, that company changed its name to the Green Bay & Minnesota Rail Road Company. On January 23, 1876, the Green Bay & Minnesota went into receivership, and the mortgage bondholders foreclosed on their mortgages. On May 16, 1881, a committee of the mortgage bondholders chartered the Green Bay, Winona & St. Paul Railway Company, which purchased the property of the Green Bay & Minnesota at a foreclosure sale. That company defaulted on the interest payments due on its first mortgage bonds on August 1, 1888, and went into receivership on July 31, 1890. A voluntary reorganization agreement was reached in 1892, but proved unsuccessful. On December 27, 1895, another foreclosure sale was ordered. At that sale in May 1896, a committee for the first consolidated mortgage bondholders purchased the property of the railroad.

On May 27, 1896, the GB & W charter was issued. That charter embodied a plan of reorganization between the securities holders of the Green Bay, Winona & St. Paul Railway Company. The members of the first consolidated mortgage bond committee were identified as the purchasers of the railroad and property and as the incorporators and first board of directors of GB & W. The articles of incorporation provided for three types of securities: $2,500,000 of $100 par value capital stock; $600,000 of $1,000 face value Class A debentures; and $7,000,000 of $1,000 face value Class B debentures.

The 25,000 shares of capital stock were distributed to the first mortgage and first consolidated mortgage bondholders of the Green Bay, Winona & St. Paul Railway Company. The 7,000 Class B debentures were to be distributed to the holders of the second mortgage income bonds and to the holders of the common and preferred stock of the Green Bay, Winona & St. Paul Railway, after the committee of the second mortgage income bonds and preferred and common stockholders of the Green Bay, Winona, St. Paul purchased the 600 Class A debentures for $570,000 in cash.

None of the three classes of securities have a fixed rate of return, and any annual payments that might have been paid are not cumulative. None of the securities have a maturity date; but the Class A and Class B debentures are payable only in the event of a sale or reorganization of the railroad and property of the company. Only the capital stock has voting power.

The capital structure of GB & W has remained unchanged since it was created in 1896. In January 1978, Itel acquired the GB & W through an amended tender offer. At that time, Itel acquired more than 97% of the outstanding common stock, more than 4,919 of the 7000 Class B debentures, and two of the three outstanding Class A debentures. The terms of the amended tender offer were $330 per share of common stock, $1,050 per Class A debenture, and $325 per Class B debenture.

### HISTORY OF THE CLASS
### B DEBENTURES

As noted by Chief Judge Reynolds in *Eliasen I* (569 F.Supp. at 88):

> The Class B debentures are an unusual security that cannot easily be classified. The rights that the holders of Class B debentures enjoy cannot be ascertained merely by referring to the terms of the instrument and the GB & W's articles of incorporation. Interpretation of their rights requires an understanding of the circumstances surrounding the organization of the GB & W in 1896, and of the litigation that has already occurred over these debentures.

> The unusual capital structure of the GB & W, and two terms contained in the Class B

---

1. This history is taken from *Eliasen v. Green Bay & W.R. Co.,* 569 F.Supp. 84 (E.D.Wis.1982) ("*Eliasen I*").

debentures in particular, have spawned a series of lawsuits. One of those terms provides that the Class B debenture is subordinate to the capital stock and Class A debentures for purposes of distribution of annual income. Specifically, with respect to annual income, the debenture provides:

The holders of this series of Debentures shall in lieu of interest thereon participate in the distribution of annual net income to the following extent only: viz., so much of the annual net earnings of the said Company in any year as would be applicable to the payment of dividends on stock shall be applied as follows: viz., to the holders of a Class A debenture 2½% upon the face value thereof, or if such annual net earnings are insufficient for the payment of the same, then all such net earnings shall be distributed pro rata among the holders of said Class A debentures. After payment of 2½% upon the face value of Class A debentures, the stockholders of the Company are entitled to receive the balance of such net earnings until 2½% have been paid out of the same upon the par value of said stock, and all surplus net earnings then remaining shall be paid to the holders of Class A debentures and of the stock, pro rata, until 5% shall have been paid upon the face value of said Debentures, and upon the par of said stock for such year, and any surplus net earnings arising in such year which may then remain shall be paid to and distributed among the holders of the Class B debentures pro rata. None of such payments shall be cumulative. The amounts, if any, payable upon this series of Debentures out of the net earnings in any year, will be fixed and declared by the board of directors....

The second term deals with repayment of the debenture upon maturity. The debentures do not have a specified maturity date, but rather mature only upon a sale or reorganization of the railroad and property of the company. Specifically, the Class B debentures provide:

The Green Bay & Western Railroad Company hereby certifies that this is one of a series of 7,000 of its Class B Debentures, in the sum of ONE THOUSAND DOL-LARS each, aggregating in all the sum of Seven Million Dollars, which sum of One Thousand Dollars will be payable to the bearer hereof as follows: viz., only in the event of a sale or reorganization of the Railroad and property of said Company, and then only out of net proceeds of such sale or reorganization which may remain after payment of any liens and charges upon such Railroad or property, and after payment of Six Hundred Thousand Dollars to the holders of a series of Debentures known as Class A, issued or to be issued, by said Company, in the sum of Two Million Five Hundred Thousand Dollars to and among the stockholders of said Company. Any such net proceeds remaining after such payments shall be distributed pro rata to and among the holders of this series of Class B debentures.

The first litigation arising out of the Class B debentures was reported in *Green Bay & Western Railroad Company v. Commissioner of Internal Revenue*, 147 F.2d 585 (7th Cir.1945). In that case, the issue was whether amounts paid to the holders of Class A and Class B debentures by the GB & W from its annual income should be treated as interest or dividends under the income tax laws. After reviewing the wording of the debentures, the court held that the amounts paid were dividends. In so doing, the court stated:

The debentures on their face disclose that they had no fixed maturity; that the dividends were not cumulative and were payable within the discretion of the board of directors; that there was no provision for interest on unpaid dividends; that the debenture holders had no right to maintain an action in case of default as to the payment of dividends inasmuch as such payment was in the discretion of the board of directors; that the status of the debenture holders of Class A was on a par with that of stockholders; and the rights of the debenture holders both Class A and Class B were inferior to those of creditors. Moreover, investments in the debentures represent value paid in at the time of the petitioner's incorporation and constitute a large part of its operating capital. Furthermore, the investments can be with-

drawn only at the dissolution of the corporation, they are subject to the hazards of the business and in our opinion may properly be designated as a part of the capital structure.

*GB & W v. C.I.R.*, 147 F.2d at 586–87.

This broad language is the basis of plaintiffs' initial argument that the Class B debentures are more in the nature of stock than debt, and that the debenture holders are entitled to the equity (at least in part) of the company. As noted in *Eliasen I*, however, despite its inclusion of such broad language, the court's holding in *GB & W v. C.I.R.*, was quite narrow, limited solely to the determination of how the annual payments to debenture holders should be characterized for income tax purposes.

In 1947, the Wisconsin Supreme Court in *Biltchik*, 250 Wis. 177, 26 N.W.2d 633, faced the question of whether the Class B debenture holders could compel the GB & W to make annual payments out of net income. The court held that any annual payment to the Class B debenture holders was discretionary with the board of directors, and affirmed the trial court's decision that the board had not abused that discretion. In reaching that conclusion, the *Biltchik* court reviewed both the circumstances surrounding the creation of the Class B debentures as well as its terms. With respect to the 1896 reorganization, the court specifically found:

> It is clear from the undisputed evidence that had the foreclosure suit proceeded in the common course of practice to sale of the mortgaged property neither the holders of the second-mortgage bonds nor the stockholders of the old company would have received anything. The scheme of reorganization was manifestly planned to assure that the holders of the subordinate securities should receive nothing whatever until the holders of the new Class A debentures and the new stock were compensated both through current income and on liquidation of the new corporation....

*Biltchik*, 250 Wis. at 180, 26 N.W.2d 633.

Then, in reviewing the provisions of the Class B debentures regarding distribution on sale or reorganization, the *Biltchik* court stated:

> This as to distribution on liquidation puts the holders of the Class B debentures on the footing of stockholders of an ordinary corporation. It makes them, instead of the stockholders, the owners of the equity of the corporation.

*Biltchik*, 250 Wis. at 181, 26 N.W.2d 633.

This unfortunate statement, neither part of nor necessary to the court's holding, has basically laid the groundwork for over 45 years of litigation. It is these two lines that lead plaintiffs in this case to believe that they are the owners of the equity of GB & W, and that they are entitled to the net proceeds of the sale of GB & W to Wisconsin Central after priority payments made to the Class A debenture holders and the common stockholders.

The issue before the court in *Biltchik*, however, and consequently the holding, had nothing to do with distribution upon a sale or reorganization of the railroad and its property. The sole issue before the court was whether the Class B debenture holders could compel annual payments, and the holding was that they could not. Thus, all that was decided was what rights the Class B debenture holders have to annual income earned by GB & W. This court agrees with the *Eliasen I* court's assessment that the statement in *Biltchik*,

> was made as an analogy in the context of the Court's conclusion that the increased equity of the GB & W will benefit the Class B debenture holders upon payment on the bonds. The Court was not concluding the Class B debenture holders enjoyed all the rights of the common stockholders, nor that they were the only security holders with an interest in the equity in the GB & W. Rather, the Court was simply observing that by their terms, the Class B debentures are to be paid out of the equity of the company that remains after payment of prior claims and $600,000 to the Class A debenture holders and $2,500,000 to the capital stockholders.

*Eliasen I*, 569 F.Supp. at 93 (E.D.Wis.1982).

*Eliasen I* was a class action brought by Axel Eliasen, one of the named plaintiffs in the instant action. In that case, the plaintiffs

sued GB & W and its individual directors alleging that the directors breached fiduciary duties to the Class B debenture holders by failing to act on an acquisition proposed by Itel, and then by subsequently recommending acceptance of the Itel tender offer. Plaintiffs further alleged that Itel's subsequent acquisition of GB & W, through an amended tender offer, was a *de facto* sale or reorganization of the railroad and its property entitling the Class B debenture holders to a pro rata distribution of the net proceeds after the priority payments to the Class A and capital stockholders.

After reviewing the history of the Itel acquisition, as well as the organization of GB & W and the terms of the securities and prior judicial decisions interpreting those securities, the *Eliasen I* court held that: (1) the tender offer was not a sale or reorganization of the railroad and property and, therefore, the plaintiffs were not entitled to payment on the principal of the debentures; and (2) the individual directors had not breached any fiduciary duties to the Class B debenture holders. The court never reached the issue of what interest the Class B debenture holders have in the equity of GB & W upon a sale or reorganization, but did state that whatever that interest may be, the "debentures cannot be equated to common stock." *Eliasen I*, 569 F.Supp. at 94.

The latest case arising out of the debentures was *Leuw v. Green Bay & Western Railroad Company*, No. 89 CV 53 (Cir.Ct. Wis. Feb. 1, 1993) (referred. to by both parties as "*Drexler*"). In *Drexler*, the plaintiffs, holders of 889 Class B debentures, brought an eleven count complaint against GB & W, Itel, Itel Rail and certain individual officers and directors of GB & W alleging that the defendants, particularly Itel and Itel Rail, engaged in a variety of misconduct including: vitiating the GB & W board of directors; engaging in self-dealing transactions; refusing to declare dividends, thereby causing all earnings of GB & W from 1978 through 1990 in excess of $4,600,000 to be retained by GB & W; siphoning off $7,200,000 in earnings with loans to themselves; siphoning off $17,080,000 of earnings by commercially unreasonable leases; reorganizing GB & W by merging the management of GB & W into the management of FRVR; scheming to siphon off $14,400,000 from GB & W through the pending sale of GB & W to a subsidiary of Wisconsin Central; reorganizing the capital structure of GB & W by changing records and accounts to present the Class B debentures as liabilities in the amount of $1,000 each, and the capital stock as GB & W's only equity security; and scheming to distribute all of GB & W's net assets to the capital stockholders, namely Itel Rail, after payment of $1,000 per Class B debenture and Class A debenture.

After a full trial on the merits, the *Drexler* court found that: (1) the Class B debenture holders do not have any rights as stockholders in GB & W and could not proceed against the defendants in the capacity of stockholders; (2) the plaintiffs were not on the same footing as stockholders of the corporation; (3) because the plaintiffs were not stockholders, the defendants owed them no fiduciary duties with respect to the counts seeking equitable buyout, dissolution, sale or *de facto* merger and breach of fiduciary duty. The court then found that all of the defendants' actions in managing the GB & W from 1978 through 1992 were done with the best interests of GB & W. and its security holders in mind and for valid business reasons, including the decisions not to declare dividends or make annual distributions to the Class B debenture holders. *Drexler*, at 54–58.

The *Drexler* court, like the others before it, never reached the question of the extent of the rights of the Class B debenture holders upon sale or reorganization of the railroad and property. Indeed, the court specifically stated that because of its decision it was unnecessary to reach that issue. *Id.* at 59.

It is within this historical context that this court reviews plaintiffs' complaint and defendants' motions to dismiss.

### FACTS

Plaintiffs' nine count, 122 paragraph, 82 page complaint is virtually impossible to summarize briefly. Indeed, it took plaintiffs eight pages to summarize the alleged misconduct of defendants, and the summary pre-

sented is disjointed and, frankly, of little value. The complaint is so full of historical context (both of the railroad itself and the litigation surrounding it) that plaintiffs' real allegations get lost in the mess. Most, if not all, of the history is unnecessary to present plaintiffs' claims, and indeed the complaint as a whole totally eviscerates the spirit of Rule 8, and could be stricken for that reason alone.

In essence, plaintiffs claim that beginning in 1978 defendants started an "ongoing criminal enterprise" to acquire what plaintiffs term as all of the GB & W equity-securities. They claim that Itel began a scheme to change the nature of the Class B debentures from equity status (which plaintiffs claim the courts in *GB & W v. C.I.R.* and *Biltchik* determined) to debt status, thereby limiting the value of each debenture to $1,000. Plaintiffs also claim that Itel leased GB & W railroad cars to another railroad owned by Itel on terms favorable to Itel and unfavorable to GB & W. In addition, plaintiffs claim that in 1993, when GB & W was sold to Wisconsin Central, defendants schemed to understate the value of the assets of GB & W and overstate the value of the FRVR in order to deny the Class B debenture holders their alleged right to their pro rata share of the equity of GB & W. The details of the alleged schemes are set forth in paragraph 60(a) through 60(s), pages 35 through 55 of the second amended complaint, which reiterate many of the same complaints already litigated and decided adversely to the plaintiffs in *Drexler*. Of special note is plaintiffs' claim (paragraph 60(s)(1)) that defendants Quarles and Kloehn intentionally misled the *Drexler* court by taking the position that the Class B debentures are debt instruments worth only $1,000 each. The complaint further charges Quarles and Kloehn with mail fraud for writing to the court and plaintiffs to explain that after the sale the net assets of GB & W would be distributed to the capital shareholders. It is these letters, among others, that plaintiffs rely upon for the requisite mailings to support their RICO claims based upon mail fraud.

Some of the specific acts of alleged misconduct upon which plaintiffs base their claims are as follows:

(a) Itel and Itel Rail with the advice and consent of the individual defendants vitiated the managerial responsibility of the GB & W board of directors by entering into commercially unreasonable leases with GB & W, causing an increase in costs to GB & W and a concomitant reduction in plaintiffs' equity interest. According to the complaint, from 1978 through 1991 GB & W suffered damages in excess of $17,000,-000 as a result of such leasing transactions with Itel and Itel Rail, injuring plaintiffs' alleged equity interests;

(b) From 1947 through 1977, following the *Biltchik* decision, GB & W paid out annual income to capital stock and Class A debenture holders every year, and to Class B debenture holders in "most" years. From 1978 through 1991, however, Itel and Itel Rail, with the advice and consent of the individual defendants and Kloehn and Quarles, have not paid out annual income to Class B debenture holders, and then "siphoned off" $7.2 million in GB & W profits by upstreaming cash to themselves through unsecured loans, without approval of the GB & W board;

(c) From November 1978 through May 1979, GB & W made at least six unsecured loans to Itel totaling $5.2 million, despite Itel's poor financial condition and its eventual filing for bankruptcy;

(d) From 1987 through 1991 GB & W made a series of unsecured loans to Itel and Itel Rail totaling at one point $7.7 million, with $7.2 million outstanding at the end of 1991. Plaintiffs allege that this shows that GB & W had excess cash which was not applied to corporate betterment, as required by *Biltchik*, and which jeopardized plaintiffs' "equity" interests;

(e) From March 1982 through November 1994 (the date the second amended complaint was filed in the instant case) defendants have falsified GB & W's books and records, financial statements and government filings to treat the Class B debentures as debt instruments which give their holders no proprietary interest in GB & W

and its equity, and to treat the capital stock as the only equity security. By so doing, according to plaintiffs, defendants have transferred all of GB & W's equity above $1,000 per share of capital stock from the Class B debenture holders to Itel. Specifically, plaintiffs allege that after *Biltchik,* until March 8, 1982, GB & W listed the Class B debentures under the stockholders' equity portion of the balance sheet. In March 1982, defendants altered the books to show the Class B debentures as debt instruments in the amount of $1,000 each. Annual financial reports sent to stockholders via U.S. mail from 1982 through 1993 indicate the Class B debentures as debt, and "imply" that GB & W is a wholly owned subsidiary of Itel Rail. These books and records, financial reports, and government filings were allegedly used by defendants to deceive creditors by making it appear that Itel and Itel Rail were and are the owners of all GB & W equity, and were presented to banks to acquire loans.

The list presented above is an just an example of defendants' alleged misconduct, and is not intended to be exhaustive. It is representative, however, of the type of misconduct alleged by plaintiffs, all of which center around the defendants' control of GB & W· and their actions that allegedly decreased the value of GB & W and thus decrease plaintiffs' alleged equity interests, including the defendants' having sold GB & W to Wisconsin Central at a fraudulently low price.

### DISCUSSION

· Both parties agree that the Class B debentures have now "matured" as a result of the sale of GB & W to Wisconsin Central, triggering the disbursement upon liquidation provision of the debentures. Thus, the issue that was never reached in *GB & W v. C.I.R., Biltchik, Eliasen I,* and *Drexler,* namely, how much of the proceeds (if any) of the sale are to be distributed to the Class B debenture holders upon liquidation, is now squarely before this court.

The parties disagree, however, as to how much of plaintiffs' complaint rests upon this one issue. Defendants contend that plaintiffs' entire complaint rests on their simple assertion that the Class B debenture holders are entitled to the net assets of GB & W after payment of: (1) all debt and liens; (2) $600,000 to the Class A debenture holders; (3) $2,500,000 to the common stockholders. (Defendants' memorandum in support, p. 33.) Plaintiffs deny that their entire complaint rests upon this assertion, but do admit that "[t]he asset-distribution provision of the Class A and Class B debentures is a core matter at issue between the parties herein." (Plaintiff Memorandum in Opposition ("Plf. Memo."), p. 1.)

The court agrees with defendants that the amount of net assets to be distributed to the Class B debenture holders upon the sale or reorganization of GB & W is *the* core issue in this dispute. As alleged in paragraph 4 of the Second Amended Complaint (which is realleged in all counts), plaintiffs' claims are predicated on the alleged scheme by defendants "to destroy the value of the Class B debentures such that their value never exceeded their face value," and in their memorandum in opposition to defendants' motion for summary judgment plaintiffs state that "all schemes were put into place for purpose of stealing from the plaintiffs their rights to their share of the net proceeds and providing those net proceeds to Itel." (Plf. Memo., p. 11.)

Thus, even plaintiffs admit that the core issue to be decided by this court is whether plaintiffs have any rights to a share of the net proceeds. If not, then plaintiffs have no right to complain of defendants' conduct, cannot state a claim under any theory, and the complaint must be dismissed. If plaintiffs do have a right to the net proceeds, then the court must examine defendants' other arguments that the complaint fails to state a claim upon which relief may be granted, violates Fed.R.Civ.P. 8(a)(2), and fails to plead fraud with particularity as required by Fed. R.Civ.P. 9(b).

·Despite all of the previous litigation and the vast amount of paper filed by the parties, the issue before this court is a relatively simple matter of contract interpretation. The court must interpret the meaning of the

asset/distribution provision contained in the Class B debenture in accordance with well-established rules of contract construction.

■ The general rule of contract interpretation is to determine the intent of the parties from the instrument as a whole, and not necessarily from isolated or particular parts thereof. *Carey v. Rathman*, 55 Wis.2d 732, 200 N.W.2d 591, 594 (1972).[2] The meaning of particular parts or words in a contract should be determined in light of and consistent with the general purpose of the agreement. *Id.* Since language in written instruments derives its meaning from its use in reference to other language and the general purpose sought to be expressed, the specific phrases and words must be considered in relation to the nature and the object of the transaction, and read in light of other provisions of the contract and of the circumstances surrounding its execution. *Id.*

■ The specific provision in question provides as follows:

The Green Bay & Western Railroad Company hereby certifies that this is one of a series of 7,000 of its Class B Debentures, in the sum of ONE THOUSAND DOLLARS each, aggregating in all the sum of Seven Million Dollars, which sum of One Thousand Dollars will be payable to the bearer hereof as follows: viz., only in the event of a sale or reorganization of the Railroad and property of said Company, and then only out of net proceeds of such sale or reorganization which may remain after payment of any liens and charges upon such Railroad or property, and after payment of Six Hundred Thousand Dollars to the holders of a series of Debentures known as Class A, issued or to be issued, by said Company, in the sum of Two Million Five Hundred Thousand Dollars to and among the stockholders of said Company. Any such net proceeds remaining after such payments shall be distributed pro rata to and among the holders of this series of Class B debentures.

This language is plain and unambiguous, and in this court's view can logically be interpreted in only one manner. Each debenture is one of a series of 7,000, each of which is in the sum of $1,000. That sum of $1,000 is payable to the bearer only in the event of the sale or reorganization of GB & W. The sum of $1,000 is payable only out of the net proceeds of any such sale or reorganization, and only if any proceeds remain after payment of all liens and charges, and after payment to the Class A debenture holders and common stockholders. If there are enough proceeds remaining, each Class B debenture holder will then receive the sum of $1,000 per debenture. If there is not enough money left after payment to the Class A debenture holders and the common stockholders to pay the $1,000 face value per outstanding debenture, then any such net proceeds as are remaining will be distributed to the Class B debenture holders on a pro rata basis. It is clear to this court that the parties intended that the Class B debenture holders were to receive $1,000 per debenture if there was enough money available to pay all of them that sum. If there was not enough money available to pay $1,000 per each debenture, then whatever money was available would be distributed on a pro rata basis.

Plaintiffs seek to compel a different result by relying on the last sentence, which states, "Any such net proceeds remaining after such payment shall be distributed pro rata to and among the holders of the series of Class B debentures." Viewed singularly and out of context, one could conclude that this line was intended to mean that the Class B debenture holders would receive all net proceeds remaining, even in excess of the face value of the debentures, making the Class B debenture holders owners of the equity of the company, as plaintiffs assert.

Such an interpretation would, however, require the court to ignore the statement in the first sentence of the debenture providing, "which sum of $1,000 will be payable to the bearer hereof as follows." It is a basic axiom of contract construction that a contract must be construed to give meaning to each of its provisions, *American Motorists Insurance Co. v. Trane Co.*, 544 F.Supp. 669, 678 (W.D.Wisc.1982), and that an interpretation

---

**2.** The parties agree that Wisconsin substantive law applies in this action.

that gives reasonable meaning to all provisions is preferable to one that leaves part of the language useless or inexplicable or creates surplusage. *Heritage Mut. Ins. Co. v. Truck Ins. Exchange,* 184 Wis.2d 247, 516 N.W.2d 8 (1994). Plaintiffs' interpretation would render the initial passage of the debenture (as well as most of the language quoted above) meaningless, and cannot be accepted.

Plaintiffs further assert that the wording of the Class B debentures cannot be read alone, but must be read in conjunction with the Class A debentures, the Articles of Incorporation and the Reorganization Agreement, because they were all drafted as part of a single transaction. The Reorganization Agreement provides in part:

> The said certificates of stock and debentures are to provide that no mortgage shall at any time be placed upon the said railroad or property, nor shall the same be leased or sold, without the consent of the holders of seventy-five percent in par value of the new Company at any time outstanding and in case of any future sale or reorganization shall, after payment of all liens and charges upon said property, be first distributed to and among the holders of Class A debentures and the stockholders pro rata, and any surplus remaining after payment of the face value of said Class A debentures and the par of said stock, shall be distributed pro rata to and among the holders of the Class B debentures.

The Articles of Incorporation contain language substantially similar to that found in the Class B debentures. Likewise, the Class A debentures contain language that indicates that the Class B debentures are payable only out of the proceeds from a sale or reorganization, and that only after payment of all liens and charges, the entire face value of the Class A debentures and entire par value of capital stock, then any surplus is to be distributed among the holders of the Class B debentures.

Plaintiffs argue that when read together, these documents can lead only to the conclusion that the Class B debenture holders are to receive all of the surplus proceeds from the sale of GB & W to Wisconsin Central. Plaintiffs argue that this conclusion is consistent with, and indeed compelled by *GB & W v. C.I.R.*

The court disagrees. First, as already noted, *GB & W v. C.I.R.* held only that annual payments to the debenture holders were to be treated as dividends for income tax purposes. The court never held that the Class B debenture holders were on equal footing with the capital stockholders.

Even read together, all that the documents indicate is that the Class B debentures are subordinate to both the Class A debentures and the capital stock for purposes of distribution upon a sale or reorganization. The documents merely set out a payment scheme that provides that the Class B debenture holders are paid last, after all liens, charges, and the required payments to Class A debenture holders and the capital stockholders. Nothing in any of the documents indicates to this court that the Class B debenture holders are to receive anything other than face value, as clearly stated in the debenture itself.

Moreover, if this court is to look beyond the four corners of the Class B debentures (as plaintiffs contend), the court cannot read the documents in a vacuum, but rather must interpret them in light of the circumstances surrounding their creation. *See,* e.g., *Heritage Mutual,* 184 Wis.2d 247, 516 N.W.2d 8 (1994). As held by the *Eliasen I* court, GB & W was not designed to pursue the interests of the Class B debenture holders, whatever their interest in the equity. The history of the GB & W reorganization indicates that the GB & W structure of priority and control was adapted entirely to protect the investment of the holders of the capital stock and Class A debentures. Despite plaintiffs' argument that valuable consideration was exchanged for the debentures, it is beyond dispute that the Class B debentures were offered to give some hope of eventual recovery to the stockholders and second mortgage bondholders of the Green Bay, Winona & St. Paul Railroad, who would have recovered nothing had that railroad been foreclosed.

Viewed in light of these circumstances, it is unreasonable to interpret the document to mean, as plaintiffs suggest, that if GB & W

were ultimately to prosper, the Class B debenture holders, whose interests were subordinate to all others and who had given up virtually worthless securities for their debentures, would be the ultimate beneficiaries of that prosperity. It is far more reasonable and logical to interpret the document as it is plainly written: if the railroad prospered and was ultimately sold or reorganized, if there were sufficient funds after all other priority payments were made, the Class B debenture holders would receive the sum of $1,000. If there were not sufficient funds for each Class B debenture holder to receive $1,000 per debenture, then whatever funds were remaining would be distributed on a pro rata basis. Accordingly, the court concludes that the document is clear and unambiguous and under its plain wording, plaintiffs are not entitled to anything more than $1,000 per debenture upon the sale of GB & W to Wisconsin Central.

Because all of the plaintiffs' claims are predicated upon their incorrect assertion that they, as Class B debenture holders, are the real holders of the equity of GB & W, the complaint as a whole fails to state a claim upon which relief can be granted and must be dismissed.

### CONCLUSION

For the reasons set forth above, defendants' motion to dismiss is granted.